1
2
3
4
5

Otto W. Immel
QUARLES & BRADY LLP
1395 Panther Lane, Suite 300
Naples, FL  34109
Phone: (239) 659-5041
Fax: (239) 213-5449
oimmel@quarles.com
*Admitted Pro Hac Vice*

6
7
8
9
10

Steven B. Sacks, Calif. State Bar No. 98875
Sheppard, Mullin, Richter & Hampton LLP
Four Embaccadero Center
17th Floor
San Francisco, CA 94111
Phone: 415-434-9100
CA State Bar No. 98875

11

*Attorneys for Plaintiff Patrick Hansen*

12

UNITED STATES DISTRICT COURT

13

NORTHERN DISTRICT OF CALIFORNIA

14

SAN FRANCISCO DIVISION

15

16
17
18
19
20
21

PATRICK HANSEN,

        Plaintiff,

v.

CENTIMARK CORPORATION,

        Defendant.

Case No.  C-08-2611-SI

Assigned to the Honorable Susan Illston

**DECLARATION OF PATRICK J. HANSEN**

22
23
24

     1.     I, Patrick J. Hansen, am a resident of the state of California.  I currently reside in San Ramon, California with my wife and our three young children.

25
26
27

     2.     Except for the time period of 1998-2002, I have lived in California my entire life. Between 1998 and 2002, I was temporarily living in Colorado with the expectation that my employer at the time would eventually relocate me to California.

28

3.      On January 31, 2003, I began working for CentiMark Corporation ("CentiMark") as a national accounts manager for its roofing division, serving northern California as well as a few other western states.

4.      While employed by CentiMark, I worked primarily out of its San Leandro, California office.  In executing my duties, I occasionally traveled to other areas on the west coast as well as Hawaii.

5.      My supervisor at CentiMark was initially located in Illinois.  Later, I reported to Randy Axelson who officed in California.  My administrative assistant, Doris King, was also located in California.

6.      The office for CentiMark's National Accounts Management ("NAM") team is located in West Chicago, Illinois.  CentiMark's Senior Vice President for its NAM team, Glenn Jones, is located in CentiMark's West Chicago office.  Employees providing administrative support to the NAM team are also located in CentiMark's West Chicago office.

7.      At the times that I applied for, interviewed for, and accepted employment with CentiMark, I was physically located in California.

8.      At the time I accepted employment with CentiMark, I was not aware that CentiMark would require that I execute a non-compete agreement as a term and condition of my employment.  CentiMark did not inform me of this requirement until after I had accepted its offer of employment and after I had resigned from my other employment.

9.      I was physically located in California at the time I was presented with and executed the non-compete agreement which is attached to my complaint (the "Agreement").

10.      In early 2008, I was looking for new employment due to my dissatisfaction with CentiMark's management.

11.     In February 2008, I consulted a California attorney about the enforceability of the Agreement.  That attorney informed me that the Agreement may not be enforceable under California law and that I should consider seeking a declaratory judgment to that effect if I chose to leave CentiMark.

12.     To further my job hunt, I posted my resume on the internet, and an independent, third-party recruiter contacted me shortly thereafter.

13.     The recruiter inquired as to my interest in Tecta America Corp. ("Tecta"), a roofing company, and made arrangements for me to interview with Tecta at its corporate offices in Skokie, Illinois.

14.     After meeting with Tecta, I was intrigued by its experience in green roofing, its focus on new construction and service contracts (as opposed to sales contracts), and its kinder management style.  Sometime after March 13, 2008, Tecta offered me a position as a national account manager for California, and I accepted.

15.     On April 21, 2008, I resigned my employment with CentiMark

16.     Prior to my resignation, my attorneys were instructed to prepare a declaratory judgment action challenging the enforceability of the Agreement.

17.     On April 22, 2008, I authorized my attorneys to file suit in California Superior Court.  I did not instruct my attorneys to file suit as a result of any threat made by CentiMark.  Rather, my intent to sue was solidified prior to my resignation.

18.     On April 23, 2008, my attorneys filed a lawsuit in California Superior Court.

19.     That lawsuit was personally served on CentiMark the following day, April 24, 2008.

20.     On May 12, 2008, I began working for Tecta.

21.    I have physically been present in Pennsylvania on just two occasions: once shortly after I was hired by CentiMark in early 2003 and the second in November 2007. Both visits were short and unrelated to this lawsuit. My first visit was at the urging of my manager while I was employed by CentiMark who requested that I join him in a visit to Pittsburgh to meet some of CentiMark's employees. The visit lasted just one day. My second visit was even shorter, lasting just a half of a day and for the purpose of receiving some training.

22.    Attached hereto as Exhibit A is a true and correct copy of the Verified Complaint filed by CentiMark in the United States District Court for the Western District of Pennsylvania, Civil Action No. 08-0593, on April 30, 2008.

1    I declare under penalty of perjury that the foregoing is true and correct to the best of my

2    knowledge.

3

4    Dated: July 31, 2008.

5                                        s/ Patrick J. Hansen
6                                        PATRICK J. HANSEN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CENTIMARK CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. _____ |
| v. | ) | |
| | ) | |
| TECTA AMERICA CORP., VINCENT J. | ) | |
| VITEK, and PATRICK J. HANSEN, | ) | |
| | ) | |
| Defendants. | ) | |

## VERIFIED COMPLAINT

Plaintiff CentiMark Corporation ("CentiMark") by and through its undersigned counsel, Buchanan Ingersoll & Rooney PC, files the within Verified Complaint against two of its former employees, Vincent J. Vitek ("Vitek") and Patrick J. Hansen ("Hansen"), and their new employer, Tecta America Corp. ("Tecta").

## INTRODUCTION

1.      CentiMark brings this action to protect its valuable trade secrets, enforce its former employees' contractual obligations regarding competitive activity, prevent them from divulging confidential business strategies and information to a primary competitor of CentiMark, and prohibit that competitor from unfairly utilizing such confidential information.

2.      Vitek and Hansen were members of CentiMark's National Accounts Group for many years.  Both had access to CentiMark's unique national marketing strategies, processes, and pricing — and both used that confidential information to develop relationships with CentiMark's largest and most significant national customers, who repeatedly require roofing products and services at their commercial facilities throughout the United States — until they simultaneously resigned from CentiMark on April 21, 2008.


Exhibit
A

3.      Both Vitek and Hansen immediately joined Tecta, one of CentiMark's primary competitors in the roofing industry, in flagrant breach of their non–compete agreements with CentiMark.  Tecta has been rapidly growing its business from a small local roofing company into a large national firm, and strategically hired Vitek and Hansen in order to unfairly gain access to both CentiMark's unique national marketing strategies, pricing practices and the valuable customer relationships that CentiMark has developed over the years with its largest "national account" customers.

4.      If left unstopped, Vitek and Hansen will continue to use CentiMark's unique national marketing strategies, value propositions and its considerable goodwill for the benefit of Tecta, thereby enabling Tecta to unfairly compete with CentiMark in the highly–competitive marketplace.

5.      CentiMark will suffer immediate and irreparable harm if Defendants' violation of their contractual obligations, misappropriation of CentiMark's trade secrets, and breach of their common law duties are not immediately enjoined.

## PARTIES

6.      CentiMark is a Pennsylvania corporation with its principal place of business located in Canonsburg, Pennsylvania.

7.      Tecta is a Wisconsin corporation with its principal place of business located at 5215 Old Orchard Road, Suite 880, Skokie, Illinois 60077.

8.      Vitek is an adult individual who is believed to reside at 3240 Pleasant Plans Drive, St. Charles, IL  60175.

9.      Hansen is an adult individual who is believed to reside at 11657 Amarillo Court, Dublin, California 94568.

2

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this civil action under 28 U.S.C.

§ 1332(a)(1) because the matter in controversy exceeds the sum of $75,000, exclusive of interest

and costs, and is between citizens of different states.

11.     This Court has personal jurisdiction over Tecta because it carries on continuous

and/or systematic general business in this jurisdiction.

12.     This Court has personal jurisdiction over Vitek and Hansen because they have the

required minimum contacts with this forum to establish personal jurisdiction.  They were

employed by CentiMark, which is headquartered in this district just outside of Pittsburgh, and

received compensation from CentiMark's offices in Pittsburgh.  Vitek and Hansen visited

CentiMark's offices in Pittsburgh, attended meetings in Pittsburgh, corresponded regularly with

the Pittsburgh office, and reported to management officials in Pittsburgh.

13.     Venue is proper in the United States District Court for the Western District of

Pennsylvania under 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions

giving rise to the claim occurred in this District.

## FACTUAL BACKGROUND

**A.     CentiMark's Business**

14.     Founded in Pittsburgh in 1968, CentiMark has grown to become one of the largest

commercial and industrial roofing contractors in the United States.

15.     CentiMark markets, sells, installs, and services roofs and roofing systems to

commercial, institutional and industrial customers throughout the United States and Canada.

CentiMark operates out of approximately 50 North American offices.

16.    The roofing industry is a highly competitive marketplace, with many companies offering similar services and vying for the same large industrial, institutional and commercial roofing projects.  Because of the size and importance of many of these significant projects, price and quality — while important factors — are not the only variables that customers consider in selecting a roofing contractor.

17.    CentiMark focuses much of its national account sales efforts through a dedicated sales force comprised of individual national account managers who are assigned to national accounts headquartered in specific territories or specific national accounts or programs.

18.    CentiMark's sales force develop sales through building relationships with local and/or national customers.  These relationships, built over time, are oftentimes the most important factor in roofing contractor selection and customers come to rely upon "their salesperson" as their point of contact and the "face" of CentiMark.

19.    CentiMark's local project managers inspect roofs, occasionally coordinate service calls for repairs, provide quotes and estimates for roofing or repair jobs, serve as the liaison to local customers for all roofing needs, and assist in the management of ongoing roofing projects.

20.    Nearly twenty (20) years ago, CentiMark created a national sales force — known as its National Accounts Group — to complement its local sales force.  Members of the National Accounts Group manage the relationships with CentiMark's largest customers, some of whom own hundreds or even thousands of commercial facilities throughout the United States.

21.    These "national account" customers are the most likely to require large roofing installation, repair, and service projects in the future in a multitude of locations (sometimes encompassing projects throughout North America).  They are also the most likely to be large repeat customers.

22.     CentiMark's strategies, processes, and approach to marketing services to these customers differs significantly from the strategies for obtaining projects from local companies. CentiMark crafted its unique national marketing strategies, through the trial–and–error process spanning several decades, into a critical component of its marketing strategy that has given it a considerable competitive advantage over its competitors. CentiMark has refined a methodology utilizing its participation in various "group purchasing organizations" and other leveraged marketing techniques which provide it with a unique national sales approach. CentiMark believes, and the individual defendants have acknowledged, that CentiMark maintains the only true national sales team in the roofing industry.

23.     The National Accounts Group has been so successful that, although it is comprised of only approximately twenty five (25) national account managers, it generates approximately sixty percent (60%) of CentiMark's sales revenue.

24.     For these reasons, CentiMark's "national" salespeople are critically important to CentiMark's continued business development and retention of existing clients. CentiMark places a great deal of trust in its national salespeople by entrusting them with the company's most vital assets: CentiMark's selling strategies, marketing and pricing methodologies, and processes for cultivating relationships with the largest existing and prospective long–term customers, and management responsibility over those relationships.

25.     CentiMark also entrusts its national salespeople with the confidential information regarding its customers and potential customers, pricing, products, services, customer complaints, profit margins, sales, sales volumes, material costs, key contacts with customers, unique vendor and supplier relationships, unique customer needs, and warranty information. All of this confidential information, taken together, creates a unique platform for CentiMark to

obtain and maintain valuable business relationships, differentiating CentiMark from its competitors.

26.    CentiMark expends a great deal of time, effort, and money to build strong customer relationships with its national customers.  It further supports these salespeople and their efforts to build strong customer relationships on behalf of CentiMark by providing a dedicated service department that provides effective service, responsive operations staff;  high quality roofing products and roofing systems that are consistently improved and updated; full time exclusive administrative support; a dedicated technical/estimation support staff to assist in preparing proposals; customer directories and/or reimbursement of expenses incurred in creating a customer database; computer hardware, software, and support services for use in preparing proposals and maintaining customer relationships; and the strength and recognition of the CentiMark name.

27.    CentiMark expanded its business into a national roofing company primarily through internal growth, much of which is attributed to its successful and unique national marketing strategies.

28.    Because the unique national marketing strategies, processes, and information provide CentiMark with a significant competitive advantage, it has taken great care to ensure the confidentiality of such information.  CentiMark shares this information with only those members of the National Accounts Group who require the information to perform their job functions, and requires that those individuals sign agreements which prohibit them from disclosing the information.

**B.**    **Tecta's Business**

29.    Although it has been in business for only approximately five (5) years, Tecta is one of CentiMark's primary competitors in the institutional, commercial, and industrial roofing industry.

30.    In fact, Tecta now claims to be the nation's leading roofing contractor with more than 50 locations and 3,000 roofing professionals.

31.    Tecta asserts that its stature as a large national firm offers potential customers stability and assurances of quality and performance that they cannot receive from smaller, local roofing contractors.

32.    Tecta has not always been a large national roofing company, but instead has experienced "amazing growth" in recent years.  Unlike CentiMark, Tecta did not grow internally, but instead expanded by acquiring numerous local companies (each of which utilized only limited and local marketing efforts) and rolling them into Tecta as operating divisions.

33.    As a result, Tecta's sales force and marketing strategy has been historically focused on the regional level, in part as a result of its growth through "roll–ups" of formerly independent local companies.  Each Tecta division has its own independent sales force, which is responsible for developing customer relationships within its geographic region.

34.    Tecta's local sales efforts have typically not been integrated or coordinated with any other local division of Tecta.  Until recently, Tecta did not have a national sales force dedicated to developing a single "national" relationship with large customers who own hundreds of commercial facilities throughout the United States.

C.    **Vitek's Employment Agreement with CentiMark**

35.    CentiMark hired Vitek nearly 18 years ago, in September of 1990, as a Floor Sales Trainee with a base salary was $18,000 per year.

36.    Vitek had no prior experience in the roofing industry when CentiMark hired him.

37.    Vitek signed an Employment Agreement with CentiMark at the inception of his employment. *See* Employment Agreement ("Vitek Agreement"), a copy of which is attached hereto as Exhibit A.

38.    CentiMark required Vitek to sign the Vitek Agreement because his position would expose him to CentiMark's confidential and proprietary business information as well as provide him with significant access to the company's customers.

39.    Vitek acknowledged his intent to be legally bound by the Vitek Agreement, and its post–employment restrictions, which were necessary because of the access to CentiMark's trade secrets, sales methods, and customer relationships that he would gain as a result of the employment. *See* Vitek Agreement, Article III.

40.    In particular, Vitek expressly acknowledged and agreed that:

> it is essential for the proper protection of the business of CENTIMARK that Employee be restricted within the parameters and in accordance with the provisions contained hereinafter from (a) soliciting or inducing any Employee of CENTIMARK to leave the employ of CENTIMARK, (b) hiring or attempting to hire any employee of CENTIMARK, (c) soliciting the trade of, or trading with, the customers and suppliers of CENTIMARK for any business purpose, and (d) competing against CENTIMARK for a reasonable period following the termination of Employee's employment with CENTIMARK.

Vitek Agreement, Article III.

41.    In the Vitek Agreement's non–compete provision, Vitek agreed that for a period of two (2) years following the termination of his employment with CentiMark:

Employee shall not, in any of the regions and/or divisions and/or territories, as established by CENTIMARK, in which the Employee operated as an Employee of CENTIMARK, engage, directly or indirectly, whether as a principal or as agent, officer, director, employee, consultant, shareholder, or otherwise, alone or in association with any other person, corporation or other entity, in any Competing Business.

*Id.* at Article 4.05.

42.    The Vitek Agreement expressly defines "Competing Business" as:

(a)    any person, business, enterprise or other entity which sells or attempts to sell any products or services, or other combination thereof, which are the same as, or similar to, the products and services sold by CENTIMARK at any time, and from time to time, during the last three (3) years prior to the termination of Employee's employment hereunder or subsequent thereto during the period of time in which Employee is restricted from competing with CentiMark pursuant to the provisions of this Agreement.

(b)    any person, business, enterprise, or other entity which solicits, trades with, advises, calls upon or otherwise does, or attempts to do, direct or indirectly, a business with any clients, customers, or accounts of CENTIMARK, its successors, assigns, subsidiaries or affiliates, that have done business with CENTIMARK at any time, or from time to time, during the period of Employee's employment hereunder.

Vitek Agreement, Articles 4.05(a) and (b).  However, the Vitek Agreement makes clear that the

prohibition on doing business with customers or suppliers in Article 4.05(b) only applies if doing

so would constitute engaging in a competitive business as defined in subsection (a).

43.    In the Vitek Agreement's non–solicitation of customers and suppliers provision,

Vitek expressly promised as follows:

(a)    . . . Employee further agrees that for two (2) years following termination of his employment with CENTIMARK, including, without limitation, termination by CENTIMARK for cause or without cause, Employee shall not, directly or indirectly, solicit the trade of, or trade with, any customers or suppliers, or prospective customers or suppliers of CENTIMARK.  For the purpose of this Agreement, the term "Prospective Customer" shall mean any customer, person or other business entity, contacted by

9

> CENTIMARK during the restrictive period mentioned in this
> Agreement.
>
> (b)    The prohibition on solicitation of customers and suppliers
> of CENTIMARK, as described in Paragraph 4.06(a), shall be
> limited to such solicitation which would constitute Employee's
> engaging in a competitive business, as described in Paragraph
> 4.05; however, it shall <u>not</u> prohibit the Employee, after termination
> of employment from soliciting the trade of such customers and
> suppliers while engaged in, or for the promotion and purpose of, a
> Non–Competing Business.

Vitek Agreement, Article 4.06.

44.    In the Vitek Agreement's non–disclosure of confidential information provision,

Vitek expressly promised as follows:

> Employee agrees that he shall not, without prior written consent of
> CENTIMARK, misappropriate or disclose or make available to
> any person or any entity for use outside CENTIMARK'S
> organization at any time, either during his employment with
> CENTIMARK or subsequent to termination of his employment
> with CENTIMARK, for any reason, any trade secrets, proprietary
> information or confidential information, whether or not it was
> developed by Employee.  Employee agrees not to use said
> information to his own advantage or the advantage of others except
> as required in the performance of Employee's duties to
> CENTIMARK.

Vitek Agreement, Article 4.01.

45.    Vitek further acknowledged that CentiMark's trade secrets and proprietary

information includes "business information, such as, sales, sales volume, sales methods, sales

proposals, customers and prospective customers, identity of key purchasing personnel in the

employ of customers and prospective customers, details of previous calls and personal data

regarding each individual buyer, amount or kind of purchases from CENTIMARK and its

divisions, sources of supply, system documentation, pricing data (including general price lists

and prices charged to specific customers) and marketing, production or merchandising systems

or plans."  Vitek Agreement, Article III.

46.     Vitek agreed that Pennsylvania law would govern the agreement, irrevocably submitted to the personal jurisdiction of this Court, and waived any objection to venue in this Court.  Vitek Agreement, Articles 6.05, 6.06, and 6.08.

47.     Vitek also agreed that, in the event that CentiMark prevails in any proceeding for damages or injunctive relief to enforce the Vitek Agreement, he would be liable for CentiMark's reasonable attorneys' fees, costs, and expenses in securing such relief.  Vitek Agreement, Article 5.03.

**D.      Vitek's 18–Year Employment with CentiMark**

48.     Vitek worked for CentiMark for nearly 18 years, during which time he received numerous promotions.  Each promotion provided Vitek with increased responsibility and offered him the opportunity to substantially increase his compensation.

49.     Vitek was initially promoted from a flooring salesperson to a flooring manager, where he received considerable training in CentiMark's selling methodologies.

50.     Because of his substantial success in developing customer relationships and goodwill on its behalf, CentiMark promoted Vitek to a National Accounts Manager position in approximately June, 2001.  Vitek assumed the responsibility to sell roofing products and services to, and manage CentiMark's relationship with, the largest and most lucrative existing and potential roofing customers throughout the country.

51.     During his approximately 5 years as a National Accounts Manager, Vitek used CentiMark's confidential strategies, processes, and information to develop new national based customer relationships and continued to build on existing customer relationships — all on behalf of CentiMark.  These national based customers accounted for work across North America, depending upon their particular roofing needs at any one time.

52.     Many of the customers with whom Vitek developed relationships became large, important, and repeat customers of CentiMark, generating more than $10 million of revenue on an annual basis.  Vitek used CentiMark's confidential strategies, processes, and information to develop long–standing relationships with these important customers.

53.     Some of the national accounts grew so large that CentiMark recently created a new management position within the National Accounts Group, known as a Global Accounts Manager, to manage the relationships with a select number of the company's very largest customers.  Vitek's CentiMark relationships included, among others, Sara Lee Foods, Cargill, Pepsico, Grub & Ellis and Johnson Controls.

54.     Vitek was promoted to such a Global Accounts Manager position in late 2006.  In the first year that the Global Accounts Manager position existed, CentiMark projected that Vitek would be responsible for between $15 and $20 million in annual revenues.

55.     Vitek was also a member of CentiMark's National Account Steering Committee. As one of approximately 7 or 8 members of this Committee, Vitek participated in the development and implementation of CentiMark's highest level initiatives, strategies, counterstrategies, pricing, bidding and material strategic planning relative to its national account programs.

56.     Vitek's compensation increased significantly as a member of the National Accounts Group, reaching a base salary of approximately $118,000 as of January 1, 2008.

**E.     Hansen's Employment Agreement with CentiMark**

57.     CentiMark hired Hansen more than 5 years ago, in January of 2003, as a National Accounts Manager.  Hansen's initial base salary was $90,000 per year.

58.    Hansen was highly educated, having received a Masters Degree in Business

Administration, but had no prior experience in the roofing industry.

59.    Hansen signed an Employment and Noncompetition Agreement with CentiMark

at the inception of his employment.  *See* Employment and Noncompetition Agreement ("Hansen

Agreement"), a copy of which is attached hereto as Exhibit B.

60.    CentiMark required Hansen to sign the agreement because his position would

expose him to CentiMark's confidential and proprietary business information as well as provide

him with significant access to the company's customers.

61.    In the Hansen Agreement, Hansen acknowledged that CentiMark has a legitimate

business interest in preventing him from engaging in activities which are competitive to

CentiMark.  *See* Vitek Agreement, Article 3.4.

62.    As consideration for his employment as a National Account Manager, Hansen

agreed to be bound by certain non–competition, non–solicitation, and non–disclosure obligations

after his employment with CentiMark terminated.

63.    In the Hansen Agreement's non–compete provision, Hansen agreed not to work

for a competitor of CentiMark's for a period of one (1) year following the termination of his

employment with CentiMark as follows:

> Employee agrees that for 12 months following the termination of
> Employee's employment, he or she shall not, directly or indirectly,
> accept employment with or perform, represent, solicit, sell, render
> services for, or obtain any ownership interest in (except for
> incidental purchases of registered securities for investment
> purposes) any commercial/industrial roofing/flooring contractor in
> direct competition with the Company within a Restricted Area or
> Market which in whole or in part sells or attempt to sell any
> products or services which are the same as, or similar to any
> products or services sold by the Company.  For the purposes of this
> Agreement, "Restricted Area or Market" means the geographic
> District(s) in which the Employee was employed or assigned by

13

> the Company during any portion of the three year period preceding
> the Employee's termination of employment.

Hansen Agreement, Article 3.2.

64. In the Hansen Agreement's non–solicitation provision, Hansen also agreed as

follows:

> Employee agrees that for 12 months following the termination of
> Employee's employment, he or she shall not, directly or indirectly,
> solicit the trade of, or trade with, any customer, prospective
> customer, or supplier of the Company for roofing/flooring products
> and services with whom Employee had contact during his or her
> employment with the Company. For the purposes of this
> Agreement, "prospective customer" will include any customer,
> person or other business entity, contacted by Company during
> Employee's employment with Company.

Hansen Agreement, Article 3.3.

65. In the Hansen Agreement's non–disclosure provision, Hansen expressly agreed as

follows:

> Except as authorized in writing by the Company, Employee shall
> not, during employment nor following the termination of
> employment, disclose any Confidential Information and/or
> Company Property to any third person (including any other
> employee who does not need to know same). Furthermore,
> Employee shall use Confidential Information and/or Company
> Property only as required by his or her duties to the Company or
> by law, unless Employee first obtains the written consent of an
> officer of the Company.

Hansen Agreement, Article 2.4.

66. The Hansen Agreement expressly defines Confidential Information to include

(among other data) marketing plans and strategies, competitive intelligence, supplier

information, sales information, accountant and pricing information, customer names and

contacts, customer purchasing history, and prospective customer information. Hansen

Agreement, Article 2.2.

14

67.     Hansen expressly acknowledged that the restrictive covenants in the Hansen

Agreement are reasonable, and that his experience and capabilities are such that he is able to

obtain employment in the industry after leaving CentiMark without breaching the non–compete

and non–solicitation provisions.  Hansen Agreement, Article 3.4

68.     Hansen agreed that Pennsylvania law would govern the agreement.  Hansen

Agreement, Article 4.3.

69.     Hansen also agreed that CentiMark is entitled to recover its reasonable attorneys'

fees incurred in enforcing the restrictive covenants.  Hansen Agreement, Article 4.1.

**F.    Hansen's 5–Year Employment as a National Accounts Manager**

70.     Hansen spent more than five (5) years as a National Accounts Manager for

CentiMark.  He was responsible for selling roofing products and services to, and managing

CentiMark's relationship with, the largest and most lucrative existing and potential roofing

customers throughout North America.

71.     Based in significant part upon CentiMark's unique training, and utilizing its

confidential marketing strategies and methodologies, Hansen successfully developed new

customer relationships and continued to build on customer relationships, all on behalf of

CentiMark.  These national based customers accounted for work across North America,

depending upon their particular roofing needs at any one time.

72.     Many of the customers with whom Hansen developed relationships became large,

important, and repeat customers of CentiMark, generating more than $10 million of revenue on

an annual basis.  Hansen used CentiMark's confidential strategies, processes, and information to

develop long–standing relationships with these important customers.

15

73.    Like Vitek, Hansen was also a member of CentiMark's National Account Steering Committee whereby he participated in the development and implementation of CentiMark's highest level initiatives, strategies, counterstrategies, pricing, bidding and material strategic planning relative to its national account programs.

74.    Hansen's compensation increased during his tenure with CentiMark, reaching a base salary of approximately $111,000 as of September 1, 2007.

G.    **CentiMark's Interests are Protectible**

75.    CentiMark has developed unique marketing strategies, processes, and information for its National Account Group.  This information has enabled CentiMark to successfully sell roofing products and services to large customers, manage large and capital intensive roofing projects, and maintain on–going relationships with national customers.

76.    CentiMark has taken considerable efforts to ensure that the unique strategies, processes, and information remain confidential, including (but not limited to) requiring its employees to sign restrictive covenants.

77.    The relationships that Vitek and Hansen have established with the large, national customers also represent a business interest that is valuable to CentiMark and one that it has carefully protected.

78.    These relationships were initiated, created, cultivated, nurtured and solidified at great expense to CentiMark through its salespeople and support system — and in particular the structure and support of the National Accounts Group — and are legitimate business interests worthy of protection through post–employment restrictions upon its employees.

79.    Such relationships necessarily expose salespeople to the confidential and proprietary business information of CentiMark and its customers as projects are specified,

16

quoted, installed, repaired, and serviced. In addition to developing the customer relationships

themselves, Vitek and Hansen also gained valuable insight into the roofing needs, projections

and timing of future projects, unique specifications, warranty provisions, negotiating strategies,

points of contact, and decision makers of CentiMark's most significant and lucrative "national

accounts" customers.

80.    Additionally, Vitek and Hansen were exposed to the confidential and proprietary

business information of CentiMark, including profit margins, pricing, unique problems or

difficulties faced with customers and/or projects that could be exploited by a competitor,

customer contact information, sales lists, and sales volumes of customers.

81.    If not entitled to protection, these customer relationships and confidential business

information can be and will be exploited by other roofing contractors offering the same or

similar products and service. These competitors will gain an unfair competitive advantage over

CentiMark by simply acquiring CentiMark's valuable business assets, without incurring the costs

and expenses necessary to establish such relationships or information themselves through years

of trial and effort.

**H.    CentiMark's Negotiations with Tecta**

82.    Commencing in early 2007, Tecta and CentiMark engaged in highly private and

confidential negotiations involving a potential merger, combination, or transaction involving

their businesses.

83.    Before disclosing their confidential nonpublic business information to one another

(which was necessary in order to explore the viability of a potential transaction), CentiMark and

Tecta executed a confidentiality agreement. *See* Letter Agreement dated March 13, 2007 (the

"Tecta Agreement"), a copy of which is attached hereto as Exhibit C.

84.     Tecta expressly agreed therein to protect the confidentiality of CentiMark's nonpublic business information, to use that information solely for the purpose of evaluating a potential transaction, and to refrain from misusing the information in any other way.  Tecta Agreement, p. 2.

85.     Tecta also agreed that, during the twelve (12) month period commencing on March 13, 2007, it would not solicit for hire or hire any senior management employee of CentiMark.  Tecta Agreement, p. 3.

86.     CentiMark disclosed information about its sales, business strategies, National Accounts Group and existing and potential customer relationships to Tecta during the course of these confidential negotiations.  In particular, CentiMark disclosed certain confidential and valuable information about its National Accounts Group, and the benefits associated with such a sales group.

87.     CentiMark is informed and believes that the disclosed information alerted Tecta to the fact that the National Accounts Group, and its implementation in conjunction with and as a compliment to a regional sales force, provided CentiMark with a superior ability to successfully conduct business on a national level.  It also alerted Tecta to certain of the customer relationships that CentiMark had successfully developed and cultivated over the years by virtue of the existence of its National Accounts Group — and National Account Managers such as Vitek and Hansen — which are among CentiMark's most lucrative assets.

88.     The negotiations between CentiMark and Tecta ceased in approximately Spring of 2007.  The parties did not thereafter pursue any type of transaction.

18

I.    **Vitek and Hansen Simultaneously Resign and Join Tecta**

89.    In the first quarter of 2008, CentiMark learned that Tecta was actively seeking to secure salespeople in order to establish a national sales force. Job placement companies retained by Tecta even contacted a number of CentiMark's national account managers.

90.    Representatives of CentiMark learned that these job placement companies may have contacted Vitek and Hansen (among others). Vitek and Hansen acknowledged to CentiMark that they had been contacted, but both indicated to CentiMark that they had no current interest in pursuing employment opportunities with Tecta.

91.    On April 21, 2008, Vitek resigned from CentiMark. He communicated his resignation by sending a letter to Glenn C. Jones, the Executive Vice President of National Accounts for CentiMark.

92.    In his letter of resignation, Vitek acknowledged that he had received a great deal of industry education during his 18–year tenure with CentiMark. He also acknowledged the valuable support that he received from the National Accounts Group.

93.    On the very same day (April 21, 2008), Hansen resigned from CentiMark. He also submitted a resignation letter to Glenn C. Jones.

94.    In his letter of resignation, Hansen acknowledged that his efforts were significant in developing CentiMark's strong National Accounts Group's customer base.

95.    Mr. Jones immediately learned that both Vitek and Hansen had accepted employment with Tecta.

96.    Mr. Jones promptly spoke with Mark Santacrose, the Chief Executive Officer of Tecta, who confirmed that Tecta had in fact hired both Vitek and Hansen.

97.    CentiMark subsequently obtained information which suggests that Tecta began negotiating with Vitek and Hansen in January and/or February of 2008, within the one–year time period during which the Tecta Agreement prohibited Tecta from soliciting any senior management employees of CentiMark.

98.    CentiMark likewise subsequently obtained information which suggests that Tecta was advised or became aware of the existence of Vitek and Hansen's employment agreements, and the restrictions set forth therein, but nonetheless proceeded to solicit and hire both.

**J.    CentiMark is Entitled to Preliminary and Injunctive Relief.**

99.    CentiMark is likely to succeed on the merits of this case because it has valid, enforceable agreements with Vitek and Hansen; it has legitimate business interests to protect; and Vitek's and Hansen's breaches of their post–employment obligations are open, blatant, and obvious.

100.    CentiMark's customer relationships, goodwill, market share, business opportunities, competitive advantage, confidential information, and relations with its remaining employees will be irreparably harmed if a preliminary and permanent injunction is not entered.

101.    CentiMark will suffer far greater harm if preliminary and permanent injunction is not granted than Vitek and Hansen will suffer if an injunction is granted. Vitek and Hansen will suffer no harm — they will simply be ordered to honor the promises that they made.

102.    Money damages alone cannot sufficiently compensate CentiMark, so CentiMark has no adequate remedy at law.

103.    Granting a preliminary injunction would serve the public interest because the enforcement of restrictive covenants, confidentiality agreements, and non–disclosure obligations is consistent with prudent public policy.

## COUNT I
### Breach of Contract
### (CentiMark v. Vitek and Hansen)

104.    CentiMark incorporates by reference the averments in Paragraphs 1 through 103 above as if the same were fully set forth herein.

105.    The Vitek Agreement is an enforceable contract supported by adequate consideration that was offered to, and voluntarily and knowingly accepted by, Vitek at the inception of his employment with CentiMark.

106.    The Hansen Agreement is an enforceable contract supported by adequate consideration that was offered to, and voluntarily and knowingly accepted by, Hansen at the inception of his employment with CentiMark.

107.    The post–employment restrictions contained in the Vitek Agreement and Hansen Agreement are reasonably limited to protect CentiMark's legitimate business interests.

108.    Vitek has breached and continues to breach the Vitek Agreement by accepting employment with Tecta, soliciting CentiMark's customers on behalf of Tecta, and/or disclosing or otherwise using CentiMark's trade secrets, confidential information, and proprietary marketing strategy for the benefit of himself and Tecta.

109.    Hansen has similarly breached and continues to breach the Hansen Agreement by accepting employment with Tecta, soliciting CentiMark's customers on behalf of Tecta, and/or disclosing or otherwise using CentiMark's trade secrets, confidential information, and proprietary marketing strategy for the benefit of himself and Tecta.

110.    Vitek's and Hansen's knowing, willful, intentional, and unprivileged breaches have caused — and unless abated, will continue to cause — immediate and irreparable harm to CentiMark.

21

**COUNT II**
**Misappropriation of Trade Secrets**
**(CentiMark v. All Defendants)**

111.    CentiMark incorporates by reference the averments in Paragraphs 1 through 110 above as if the same were fully set forth herein.

112.    CentiMark possesses valuable trade secrets, confidential information, and proprietary marketing strategies relating to the roofing business, its operations, its customers, its employees, its financial data, and its products.

113.    CentiMark has spent significant time and money developing its trade secrets, confidential information, and proprietary marketing strategies and has taken legitimate steps to protect such information from disclosure (including the requirement that employees who have access to the information execute employment agreements containing appropriate restrictive covenants).

114.    During the course of the development of its National Accounts Group, and through the arduous process of trial–and–error, CentiMark acquired valuable knowledge and information regarding the most effective and efficient methods of marketing roofing products and services to "national" account customers with multiple facilities located throughout the United States.

115.    This knowledge and experience involving a uniform corporate marketing strategy for "national" account customers constitutes a valuable asset of CentiMark, which CentiMark expected would be used by members of its National Sales Group for the sole purpose of cultivating customer relationships on behalf of CentiMark.

116.    The above–described confidential information falls within the definition of trade secret as defined by the Pennsylvania Uniform Trade Secret Act codified at 12 Pa. Cons. Stat. § 5301 et seq.

117.    Disclosure of CentiMark's trade secrets, confidential information, and marketing strategies to competitors (like Tecta) would severely undermine CentiMark's competitive position in the marketplace.

118.    Vitek and Hansen had access to CentiMark's trade secrets, confidential information, and marketing strategies during the course of their employment with CentiMark.

119.    CentiMark is informed and believes that, since Vitek and Hansen left CentiMark, Defendants have misappropriated, misused, and disclosed such information — and continue to do so — for the benefit of Tecta and to the detriment of CentiMark.

120.    Defendants' misappropriation of CentiMark's trade secrets has caused — and unless abated, will continue to cause — immediate and irreparable harm to CentiMark.

121.    Defendants' willful, wanton, and malicious misappropriation of CentiMark's trade secrets, confidential information, and marketing strategies constitutes outrageous conduct entitling CentiMark to an award of punitive damages.

## COUNT III
### Tortious Interference with Contract and
### Prospective Business Relations
### (CentiMark v. All Defendants)

122.    CentiMark incorporates by reference the averments in Paragraphs 1 through 121 above as if the same were fully set forth herein.

123.    CentiMark currently has a number of contractual relations with customers that are covered under the non–solicitation/non–competition provisions in the Vitek Agreement and Hansen Agreement.

124.    Because of the nature of the industry and the strong customer relationships that have been developed over time, CentiMark has a prospective contractual relationship with a number of customers and prospective customers that are covered by the non–competition/non–solicitation provisions of the Vitek Agreement and Hansen Agreement.

125.    Defendants have no privilege or justification to interfere with the contractual or perspective contractual relationships that CentiMark has with its customers or prospective customers.

126.    Defendants have acted intentionally to interfere with the contractual and/or prospective contractual relationships that CentiMark has with its customers and prospective customers.

127.    Defendants' actions have caused and will continue to cause irreparable harm to CentiMark by damaging its contractual and prospective contractual relationships with its customers; harming its goodwill; disclosing its trade secret, confidential, and proprietary business information; and causing it to suffer other compensatory damages that are not readily capable of calculation.

128.    Defendants' willful, wanton, and malicious interference with CentiMark's contracts and prospective business relationships constitutes outrageous conduct entitling CentiMark to an award of punitive damages.

## COUNT IV
### Unfair Competition
### (CentiMark v. All Defendants)

129.    CentiMark incorporates by reference the averments in Paragraphs 1 through 128 above as if the same were fully set forth herein.

24

130.    By engaging in the conduct described above, Defendants have engaged in unfair competition with CentiMark.  Such conduct has caused and will continue to cause damage to CentiMark's goodwill, customer relationships, prospective customer relationships, contractual relationships, and valuable business interests.

131.    Defendants' conduct, as described above, is contrary to honest, commercial practices.

132.    CentiMark has suffered, and will continue to suffer, immediate and irreparable harm as a result of Defendants' misconduct.

133.    Defendants' willful, wanton, and malicious acts of unfair competition constitute outrageous conduct entitling CentiMark to an award of punitive damages.

## COUNT V
### Breach of Fiduciary Duties
### (CentiMark v. Vitek and Hansen)

134.    CentiMark incorporates by reference the averments in Paragraphs 1 through 133 above as if the same were fully set forth herein.

135.    As National Accounts Managers, Vitek and Hansen were in positions of trust and confidence with CentiMark and therefore owed CentiMark the fiduciary and/or common law duties of loyalty, good faith, and fair dealing.

136.    These fiduciary duties existed not only while Vitek and Hansen were employed by CentiMark, but continued after their voluntary resignation.

137.    CentiMark is informed and believes that Vitek and Hansen breached their fiduciary duties by (among other actions) unfairly competing with CentiMark, diverting business opportunities from CentiMark, soliciting roofing customers to terminate their existing or prospective relationships with CentiMark, providing Tecta with certain confidential information

regarding CentiMark's business and strategies (including information about its National Account Group), conspiring to jointly resign from CentiMark and join Tecta, and collaborating with Tecta to utilize CentiMark's trade secrets and other confidential information.

138.    CentiMark has suffered, and will continue to suffer, immediate and irreparable harm as a result of Vitek's and Hansen's misconduct.

139.    Vitek's and Hansen's willful, wanton, and malicious breaches of their fiduciary and/or common law duties constitutes outrageous conduct entitling CentiMark to an award of punitive damages.

**COUNT VI**
**Inducement of Breach of Fiduciary Duties**
**(CentiMark v. Tecta)**

140.    CentiMark incorporates by reference the averments in Paragraphs 1 through 139 above as if the same were fully set forth herein.

141.    At all relevant times, Tecta was aware that Vitek and Hansen were National Account Managers of CentiMark, and as such, owed fiduciary and/or common law duties of loyalty, good faith, and fair dealing to CentiMark.

142.    Tecta knowingly participated in and/or induced Vitek and Hansen to breach their fiduciary duties to CentiMark.

143.    Tecta knowingly accepted the benefits of Vitek's and Hansen's breaches of their fiduciary duties.

144.    CentiMark has suffered, and will continue to suffer, immediate and irreparable harm as a result of Tecta's inducement of Vitek and Hansen to breach their fiduciary duties.

145.    Tecta's willful, wanton, and malicious inducement of these individuals to breach their fiduciary and/or common law duties to CentiMark constitutes outrageous conduct entitling CentiMark to an award of punitive damages.

## COUNT VII
### Civil Conspiracy
### (CentiMark v. All Defendants)

146.    CentiMark incorporates by reference the averments in Paragraphs 1 through 145 above as if the same were fully set forth herein.

147.    Defendants unlawfully conspired with one another to effectuate the breach of Vitek's and Hansen's fiduciary and/or common law duties to CentiMark, the tortious interference with CentiMark's contractual and prospective business relationships, and the misappropriation of CentiMark's trade secrets and confidential information.

148.    CentiMark is informed and believes that Defendants engaged in overt actions in furtherance of their conspiracy, including (but not limited to) discussing the structure, organization, and competitive advantages that CentiMark achieves by virtue of its National Accounts Group.

149.    Defendants' unlawful civil conspiracy has caused, and will continue to cause, immediate and irreparable harm to CentiMark.

150.    Defendants' willful, wanton, and malicious civil conspiracy constitutes outrageous conduct entitling CentiMark to an award of punitive damages.

## COUNT VIII
### Unjust Enrichment
### (CentiMark v. All Defendants)

151.    CentiMark incorporates by reference the averments in Paragraphs 1 through 150 above as if the same were fully set forth herein.

152.    CentiMark is informed and believes that Tecta has improperly received, or will

improperly receive, customer orders and revenues from existing and prospective customers as a

result of Vitek's and Hansen's improper conduct.

153.    Vitek and Hansen have improperly received, or will improperly receive, salary,

bonuses, commission payments, and/or other benefits from Tecta for their illegal conduct.

154.    It would be inequitable and unjust for Defendants to be permitted to retain such

benefits.  Such benefits properly belong to CentiMark.

155.    Defendants should be required to disgorge any such benefits that they improperly

obtained.

### COUNT IX
**Breach of Contract**
**(CentiMark v. Tecta)**

156.    CentiMark incorporates by reference the averments in Paragraphs 1 through 155

above as if the same were fully set forth herein.

157.    As National Accounts Managers, Vitek and Hansen were senior managers of

CentiMark.

158.    Tecta commenced discussions with Vitek and Hansen in January and/or February

of 2008 about potentially hiring them as employees of Tecta.

159.    Tecta breached the Tecta Agreement by soliciting to hire Vitek and Hansen within

one (1) year of the date of the Tecta Agreement.

160.    Tecta's knowing, willful, intentional, and unprivileged breaches have caused —

and unless abated, will continue to cause — immediate and irreparable harm to CentiMark.

**WHEREFORE,** CentiMark respectfully requests this court enter the following equitable

relief and money damages:

(a)      an order enjoining Vitek, preliminarily and then permanently for a period of two years from the date of the order, pursuant to the tolling provisions of Article 6.02 of the Vitek Agreement, from remaining in the employ of Tecta and/or any other competitor of CentiMark as set forth in Article 4.05 of the Vitek Agreement;

(b)      an order enjoining Vitek, preliminarily and then permanently for a period of two years from the date of the order, pursuant to the tolling provisions of Article 6.02 of the Vitek Agreement, from soliciting customers or suppliers of CentiMark as set forth in Article 4.06 of the Vitek Agreement;

(c)      an order enjoining Vitek, preliminarily and then permanently, from misappropriating, disclosing, or making available to any person any trade secrets or confidential information of CentiMark as defined by the Vitek Agreement and the Pennsylvania Uniform Trade Secret Act;

(d)      an order enjoining Hansen, preliminarily and then permanently for a period of one years from the date of the order, pursuant to the tolling provisions of Article 4.1 of the Hansen Agreement, from remaining in the employ of Tecta and/or any other competitor of CentiMark as set forth in Article 3.2 of the Hansen Agreement;

(e)      an order enjoining Hansen, preliminarily and then permanently for a period of one years from the date of the order, pursuant to the tolling provisions of Article 4.1of the Hansen Agreement, from soliciting customers or suppliers of CentiMark as set forth in Article 3.3 of the Hansen Agreement;

(f)      an order enjoining Hansen, preliminarily and then permanently, from misappropriating, disclosing, or making available to any person any Confidential Information or

29

Company Property of CentiMark as defined by the Hansen Agreement and/or any trade secrets

of CentiMark as defined by the Pennsylvania Uniform Trade Secret Act;

      (g)     an order enjoining Tecta, preliminarily and then permanently, from using,

misappropriating, or disclosing any trade secrets or confidential information/property of

CentiMark as defined by the Pennsylvania Uniform Trade Secret Act, the Vitek Agreement, the

Hansen Agreement, or the Tecta Agreement;

      (h)     compensatory damages in an amount in excess of $75,000, together with interest,

costs, reasonable attorneys' fees to the fullest extent permitted by law and/or the Vitek

Agreement and Hansen Agreement, and punitive damages;

      (i)     disgorgement of all revenues, profits, and compensation of any kind that

Defendants received by virtue of their improper conduct (plus interest thereon); and

      (j)     Any such further relief as the Court deems to be just and proper.

## **JURY DEMAND**

    Plaintiff respectfully requests a trial by jury on all issues triable to a jury.

Dated:  April 30, 2008                Respectfully submitted,

                             **BUCHANAN INGERSOLL & ROONEY** PC

                             By:/s/ Peter S. Russ
                                Peter S. Russ PA 58284
                                peter.russ@bipc.com
                                Gregory J. Krock PA 78308
                                gregory.krock@bipc.com

                             One Oxford Centre
                             301 Grant Street, 20th Floor
                           Pittsburgh, PA  15219–1410
                           (412) 562–1416/3983 (phone)
                           (412) 562-1041 (fax)
                         Attorneys for Plaintiff, **CentiMark Corporation**