David A. Gabianelli (State Bar No. 158170)
Andrew L. Chang (State Bar No. 222309)
SQUIRE, SANDERS & DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, CA 94111-3492
Telephone:  +1.415.954.0200
Facsimile:   +1.415.393.9887
Email:       dgabianelli@ssd.com
Email:       achang@ssd.com

Attorneys for Defendant
CENTIMARK CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

(SAN FRANCISCO DIVISION)

| | |
|---|---|
| PATRICK HANSEN,<br><br>          Plaintiff,<br><br>     vs.<br><br>CENTIMARK CORPORATION,<br><br>          Defendant. | Case No.  C-08-2611-SI<br><br>Assigned to the Honorable Susan Illston<br><br>**REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, STAY OR TRANSFER**<br><br>Hearing Date:  August 22, 2008<br>Time:  9:00 a.m.<br>Department:  10 |

## I.    INTRODUCTION[1]

The first–filed rule does not apply in this case.  Because the rule is intended to promote judicial efficiency and avoid duplicative lawsuits, deference is given to the first lawsuit only if the second action involves substantially similar issues and parties.  Hansen seeks only a declaration that the non–compete and non–solicitation provisions in his Employment Agreement are unenforceable.  The Pennsylvania Action, however, involves far more than these two provisions.  CentiMark also seeks injunctive relief and monetary damages associated with (1) Hansen's misappropriation of CentiMark's trade secrets, breach of fiduciary duty, and other tortious conduct; (2) similar misconduct of Vitek and Tecta; and (3) Vitek's breach of his separate

---

[1] Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in Defendant CentiMark Corporation's Notice of Motion and Motion to Dismiss or, in the Alternative, Stay or Transfer (the "Motion").

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, California 94111-
3492

REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS - CASE NO. C-08-2611-SI

1   employment agreement.  The Pennsylvania court will be required to resolve these issues

2   regardless of whether the two provisions in Hansen's Employment Agreement are unenforceable

3   or not.  This fact precludes any deference to Hansen's action under the first–filed rule.

4        Even if the parties and issues were substantially similar, application of the first–filed rule

5   is not warranted here because Hansen's action is an "anticipatory suit" intended to beat CentiMark

6   to the courthouse.  Hansen was aware that CentiMark would promptly file a suit against him

7   when he resigned and joined Tecta.  In fact, CentiMark had provided him with a written Memo

8   during his employment advising that CentiMark would file suit if he breached his restrictive

9   covenants (Hansen countersigned the Memo acknowledging his understanding of CentiMark's

10  intentions).  CentiMark also reminded Hansen of the restrictive covenants during his exit

11  interview, rejected Tecta's attempts to open a dialogue to discuss the dispute, and specifically

12  advised that it would be pursuing litigation.  In response to these discussions, Tecta's law firm

13  filed a cursory, 22–paragraph complaint on Hansen's behalf.  Just four business days passed

14  before CentiMark filed its voluminous 160–paragraph complaint in the Pennsylvania Action.

15  Under these circumstances, it is apparent that this action is an anticipatory suit that is not entitled

16  to "first–filed" status.

17        Finally, Hansen's contention that this Court must remand the case to state court if it does

18  not exercise jurisdiction is specious.  Not a single case that Hansen cites for this proposition

19  involves the first–filed rule in federal courts.  Instead, each case that Hansen cites involves a

20  federal court's decision to remand the case because the state court was better suited to address the

21  unique state law issues in dispute.  When two *federal* actions are pending, and the first–filed rule

22  is implicated, this Court has both dismissed and transferred removed cases from California state

23  court.  The same result is warranted here.

## II.    ARGUMENT

25        The first–filed rule is a doctrine of federal comity which permits a district court to refuse

26  to exercise jurisdiction over an action if a complaint involving the same parties or issues is

27  pending in another district.  *Pacesetter Sys. Inc. v. Medtronic, Inc.*, 678 F.2d 93, 94–95 (9th Cir.

28  1982).  The court examines three threshold factors to determine if the rule applies:  (1) the

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, California 94111-
3492

- 2 -

REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS - CASE NO. C-08-2611-SI

1    similarity of the parties, (2) the similarity of the issues, and (3) the chronology of the two actions.

2    *Z–Line Designs, Inc. v. Bell'O Int'l LLC*, 218 F.R.D. 663, 665 (N.D. Cal. 2003).

3        Even if these three factors are satisfied, the court need not apply the first–filed rule. *Id.*

4    The Ninth Circuit has explained that "[w]ise judicial administration, giving rise to conservation of

5    judicial resources and comprehensive disposition of litigation, does not counsel rigid mechanical

6    solution of such problems" involving multiple actions. *Alltrade, Inc. v. Uniweld Prods., Inc.*, 946

7    F.2d 622, 627–28 (9th Cir. 1991). Courts do not apply the rule if the plaintiff filed the initial

8    action in bad faith, as an anticipatory suit, or to forum shop. *Z–Line*, 218 F.R.D. at 665. Courts

9    also refuse to apply the rule if the second–filed action can be resolved more promptly and

10   conveniently. *Id.*

11       **A.    The First–Filed Rule's Threshold Factors Are Not Satisfied in This Case**

12           **1.    The Parties and Issues are Not Substantially Similar**

13       The requirement that the parties and issues be "substantially similar" ensures that the first–

14   filed action will effectively resolve the parties' dispute. *Shapiro v. Jupiterimages Corp.*, No.

15   C07–5540–PJH, 2008 WL 183511, at *1 (N.D. Cal. Jan. 18, 2008). In *Shapiro*, the defendant

16   moved to dismiss the first–filed declaratory judgment action so that the parties' entire dispute

17   could be resolved in the second–filed action in Connecticut. *Id.* This Court refused to apply the

18   first–filed rule, and dismissed the first action, because it did not encompass all of the issues:

19           [D]eclaratory relief would not terminate the entirety of the dispute between
             the parties. As defendant points out, the instant complaint alleges only a
20           single complaint for declaratory relief based on the provisions of the
             contract at issue between the parties, while the Connecticut action alleges
21           statutory and common law claims that go beyond just the contractual issues
             (e.g., allegations of Unfair Trade Practices Act and Uniform Commercial
22           Code violations). That action also seeks money damages, a claim that is
             also beyond the scope of the instant complaint. Furthermore, many of the
23           claims require interpretation of Connecticut state law, which the
             Connecticut district court is best placed to interpret. In sum, however, even
24           if the court were to resolve the instant action, there would still be
             significant legal and damages issues that would need to be determined
25           before the parties' dispute is fully clarified.

26   *Id.*

27       The overlap of issues in this case and the Pennsylvania Action is likewise so limited that a

28   declaratory judgment will resolve but a fraction of the parties' dispute. Here, Hansen seeks only a

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, California 94111-
3492

- 3 -

REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS - CASE NO. C-08-2611-SI

1    declaration that the non–competition and non–solicitation provisions in his Employment

2    Agreement are unenforceable.  Complaint, ¶¶ 11–14, 17.  Hansen's lawsuit does not address

3    CentiMark's claim for misappropriation of CentiMark's trade secrets.  Nor does this action pertain

4    to Hansen's tortious interference with CentiMark's existing and prospective customers, breach his

5    fiduciary duty to CentiMark, and conspiracy to use CentiMark's proprietary information to

6    unfairly compete with CentiMark – all of which are at issue in the Pennsylvania Action.  *See*

7    Verified Complaint, a copy of which is attached as Exhibit A to the Declaration of Patrick J.

8    Hansen ("Hansen Decl."), at ¶¶ 22–28, 75–81, 112–139, 147–150.  This Court's ruling on the

9    enforceability of two provisions in Hansen's Employment Agreement will have no bearing on

10   CentiMark's separate tort claims, and the Pennsylvania Action is therefore necessary to fully

11   resolve the dispute between CentiMark and Hansen.

12       In addition, and fatal to any attempt to invoke the first–filed rule, CentiMark has also

13   asserted contract and tort claims against Tecta and Vitek in the Pennsylvania Action.  CentiMark

14   therefore cannot simply avoid duplicative lawsuits by filing counter–claims against Hansen.

15   Hansen addresses this critical factor in a single paragraph by asserting that (1) parties need not be

16   identical and (2) the parties do not "substantially differ" because Hansen and CentiMark are

17   involved in both actions.  *See* Plaintiff Patrick J. Hansen's Opposition to Defendant's Motion to

18   Dismiss ("Opposition"), p. 9.  These assertions are baseless.  The fact that additional parties exist

19   in the Pennsylvania Action weighs heavily against applying the first–filed rule.  *United Techs.*

20   *Corp. v. Calaveras Cty. Water Dist.*, Civil No. 96–20369, 1996 WL 400960, at *3 (N.D. Cal. July

21   12, 2006) (rejecting first–filed rule because "if this court were to determine Calaveras' rights

22   against UTC, but not against the individual defendants . . . piecemeal litigation would result"); *see*

23   *also Buchalew v. Celanese, Ltd.*, No. Civ. A. G–05–315, 2005 WL 2266619, at *3 (S.D. Tex.

24   Sept. 16, 2005) ("The first–to–file rule does not require identical parties, but the fact that the

25   parties are different cuts against an argument for substantial overlap.").

26       In fact, the cases that Hansen cites establish that non–identical parties must have the same

27   legal interests in order to be considered "substantially similar."  *Barapind v. Reno*, 72 F. Supp.2d

28   1132, 1145 (E.D. Cal. 1999) ("The parties need not be identical. . . .  If the parties 'represent the

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, California 94111-
3492

- 4 -

REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS - CASE NO. C-08-2611-SI

1   same interests' the court may determine the second action is duplicative.").  These cases establish

2   that parties represent the same interests when they are related entities, divisions, or the like.

3   *Weinstein v. Metlife Inc.*, No. C06–04444, 2006 WL 3201045, at *4 (N.D. Cal. Nov. 6, 2006) (the

4   classes of plaintiffs in two separate class actions had the same interests, and were therefore

5   substantially similar, even though the class representatives differed); *Inherent.com v. Martindale–*

6   *Hubbell*, 420 F. Supp.2d 1093, 1099 (N.D. Cal. 2006) ("Martindale and Inherent are the parties in

7   dispute in both the New Jersey and California actions.  Although the suit in New Jersey was filed

8   by Reed, it seeks declaratory relief that Reed is not obligated, *through the actions of its*

9   *Martindale division*, to purchase any of Inherent's assets.") (emphasis in original); *Guthy–Renker*

10  *Fitness, LLC v. Icon Health & Fitness, Inc.*, 179 F.R.D. 264, 270 (C.D. Cal. 1998) (substantial

11  similarity factor satisfied where the "additionally named defendants in the two actions are merely

12  derivative manufacturers of the primary parties").

13        Tecta and Vitek are parties to separate written contracts with CentiMark, and do not

14  "represent the same interests" as Hansen.  Hansen therefore ignores this requirement and argues –

15  without citing any legal authority – that the "substantially similar" requirement is satisfied simply

16  because Hansen and CentiMark are parties to both actions.  The very cases that Hansen cites belie

17  this argument and establish that the parties are not "substantially similar."  The first–filed rule

18  therefore does not apply.

19        **2.    The Chronology Does Not Support the Application of the First–Filed**
           **Rule**

20

21        California courts have also repeatedly refused to apply the rule when the parties filed their

22  respective lawsuits within days of one another.  *Aurora Corp. of Am. v. Fellowes, Inc.*, No. CV–

23  07–8306–GHK, 2008 WL 709198, at *1 (C.D. Cal. Feb. 27, 2008) ("the first–filed rule is of no

24  utility where competing cases are filed within a short interval of one another."); *Z–Line*, 218

25  F.R.D. at 667.  In fact, in *Z–Line*, this Court refused to apply first–filed status to a California

26  declaratory judgment action filed just two days before the defendant filed its action for damages

27  in another forum.  *Z–Line*, 218 F.R.D. at 667 ("Z-Line filed this complaint only two days before

28  Bell'O filed its complaint in New Jersey.  Considering this relatively short time period between

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, California 94111-
3492

- 5 -

REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS - CASE NO. C-08-2611-SI

1  the two filings, the importance of the earlier filing date is diminished.").

2       Hansen filed his 5–page, 22–paragraph Complaint in this action on Wednesday, April 23,

3  2008.  Only four business days passed before CentiMark filed its Verified Complaint on

4  Wednesday, April 30th.  The comprehensive Verified Complaint is 30 pages long and contains

5  160 paragraphs.  Considering the relatively short time period between the filings, and the obvious

6  fact that it took longer for CentiMark to prepare a complaint which addressed the additional

7  parties and issues that are required for a complete resolution of the parties' dispute, the first–filed

8  rule does not apply.

9      **B.**    **The Court Should Not Apply the First–Filed Rule Even if the**

10           **Threshold Factors Had Been Satisfied**

11           **1.**    **The Totality of the Circumstances Establishes That This Action is an Anticipatory Suit Designed to Beat CentiMark to the Courthouse**

12       In the Opposition, Hansen deceptively quotes *Intersearch World, Ltd. v. Intersearch*

13  *Group, Inc.*, 544 F. Supp.2d 949 (N.D. Cal. 2008), in support of his argument that CentiMark did

14  not give specific and concrete indications that a lawsuit was imminent.  Hansen selectively quotes

15  *Intersearch* as stating:  "[A] letter which [merely] suggests the possibility of legal action [,

16  however] … is not a specific, imminent threat of legal action."  Opposition, p. 12.  The text that

17  Hansen has replaced with ellipses, however, is important.  This Court actually stated that a letter

18  which suggests the possibility of further action ***"in order to encourage or further a dialogue"*** is

19  not an imminent threat.  *Intersearch*, 544 F. Supp.2d at 960 (emphasis added).

20       This distinction is critical.  As is evident from the e–mail exchange the day after Hansen

21  resigned, it was Tecta – and not CentiMark – that was attempting to encourage or further a

22  dialogue.  Declaration of Mark Santacrose, Exhibit A  ("Let me know a good time to give you a

23  call.  I'd like to explain our actions with respect to yesterday's news [of the hiring of Hansen].  I'm

24  sure you had a strong reaction but I'd like to give you our perspective …").  The President of

25  CentiMark, Timothy Dunlap, rebuffed Tecta's attempt to open a dialogue, stating that the

26  misconduct could not be justified and that CentiMark was exploring its legal options.  *Id.*  Unlike

27  *Intersearch*, Mr. Dunlap's reference to litigation terminated, rather than encouraged, any further

28  dialogue to resolve the matter amicably.  The e–mail constituted specific and concrete evidence of

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, California 94111-
3492

- 6 -

REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS - CASE NO. C-08-2611-SI

1    imminent litigation in light of the surrounding circumstances.[2]

2        The e–mail is not the only notice that CentiMark provided to suggest that an action was

3    imminent.  Hansen also knew that litigation was forthcoming because:

- Mr. Dunlap had previously sent a written Memo to Hansen to advise him of CentiMark's intention to enforce the restrictive covenants in the Employment Agreement.  *See* Memo signed by Patrick J. Hansen, a copy of which is attached hereto as Exhibit A.  In the Memo, Mr. Dunlap stated: "[T]here is a strong commitment by [CentiMark] to aggressively pursue anyone who violates the terms of his/her Employment Agreement.  An aggressive practice to recover financial retribution, court costs and legal fees will be sought as part of any suit involving a violation of a CentiMark Employment Agreement." *Id.* at p. 1.

- Hansen signed the Memo to reflect that he read and understood it, and returned a copy to CentiMark.  *Id.* at p. 2.

- The Vice President of Human Resources also reminded Hansen of the restrictive covenants during his exit interview on the day that he resigned. *See* Declaration of Barbara J. Felton in the Pennsylvania Action, a copy of which is attached hereto as Exhibit B, at ¶ 4.

- As set forth in the Motion, CentiMark spoke with the President of Tecta on the day after Hansen resigned.  Declaration of Timothy Dunlap, a copy of which is attached hereto as Exhibit C, at ¶ 2.  Tecta expressed the desire to resolve the parties' dispute amicably without the need for court intention. *Id.* at ¶ 3.  CentiMark declined to entertain such a possibility, and instead stated that it would immediately pursue litigation against Tecta, Hansen, and Vitek.  *Id.* at ¶ 4.

17   These circumstances, in addition to the e–mail exchange, establish that Hansen knew that

18   litigation was forthcoming.  In fact, Hansen acknowledges in his carefully crafted declaration that

19   he did not actually authorize the filing of his lawsuit until *after* CentiMark made its intention to

20   sue Tecta, Hansen, and Vitek abundantly clear.  *See* Hansen Decl. at ¶¶ 16–17.

21       In addition, the skeletal nature of Hansen's complaint suggests that he was rushing to get it

22   on file before CentiMark sued him.  In *Shapiro*, this Court recently relied upon the fact that the

23   plaintiff filed a cursory declaratory relief complaint as evidence that its action was an anticipatory

24   suit intended to win a race to the courthouse:

No more than 48 hours after that conversation [in which the defendant discussed the possibility of filing a lawsuit], plaintiffs' state court

---

[2] Hansen also cites to *Guthy–Renker* regarding the characteristics of concrete indications of an imminent lawsuit.  Opposition, pp. 11–12.  Like *Intersearch*, the letter in *Guthy–Renker* was intended to avoid litigation by encouraging settlement discussions.  *Guthy–Renker*, 179 F.R.D. at 271.  In fact, the company president who authored the letter admitted that he did not intend to threaten suit in his letter.  *Id.  Guthy–Renker* is therefore inapposite.

SQUIRE, SANDERS & DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, California 94111-3492

complaint was filed – a check the box complaint that contains no specific or detailed allegations, and requests declaratory relief in a conclusory fashion. On the whole, the court finds these facts suggestive of an attempt to beat defendant to the courthouse door ….

*Shapiro*, 2008 WL 183511, at *2 (internal citation omitted); *see also Ex–Im Plastics, Inc. v. Miwon Am., Inc.*, No. CV–96–5710–JED, 1996 WL 928189, at *5 (C.D. Cal. Oct. 28, 1996) (the fact that the first action seeks only declaratory relief, rather than damages, "is another 'red flag' that there may be compelling circumstances to depart from the first–to–file rule."); *United Technologies*, 1996 WL 400960, at *2 ("Courts have repeatedly rejected the 'first to file' rule in light of the policies governing declaratory relief.").[3] Hansen's failure to seek a preliminary injunction between April 23rd and May 12th, when he purportedly reported to work at Tecta, further establishes that he filed this action not to obtain an immediate ruling as to his ability to work for Tecta, but instead to beat CentiMark to the courthouse.

The circumstances surrounding Hansen's consultation of various legal counsel further suggest that this lawsuit was anticipatory in nature. Hansen asserts that he consulted an unidentified California attorney in February of 2008, **before** he contacted Tecta, and was advised that he should consider a declaratory judgment action if he left CentiMark. Hansen Decl. at ¶ 11. Hansen then asserts that he instructed his attorneys to prepare such an action before he resigned, but did not authorize the filing until the day after his resignation. *Id.* at ¶¶ 16–17. The attorney who filed this action on Hansen's behalf, however – Charles W. Herf, who practices in the Phoenix office of Quarles & Brady LLP – does not appear to be the California attorney that Hansen originally contacted. In fact, Quarles & Brady has previously represented Tecta in other matters. Conveniently, Mr. Herf promptly withdrew as counsel and Otto Immel, the attorney at Quarles & Brady who is defending all defendants in the Pennsylvania Action (including Hansen),

---

[3] Hansen incorrectly cites *Stemcells, Inc. v. Neuralstem, Inc.*, No. C08–2364–CW, 2008 WL 2622831, at *2 (N.D. Cal. July 1, 2008), for the proposition that the fact that the first action seeks only declaratory relief is irrelevant in assessing the first–filed rule's applicability. Opposition, p. 9. In *Stemcells*, this Court stated only that the **factors** that courts must consider in the analysis are the same. *Stemcells*, 2008 WL 2622831, at *1. The Court did not hold that the declaratory nature of the first action cannot be considered in assessing those factors, including the similarity of the issues, the likelihood that the plaintiff was racing to the courthouse, and the judicial efficiencies and convenience associated with permitting the second action to resolve the parties' dispute. *Id.* To the contrary, the courts' analyses in the *Shapiro*, *Ex–Im*, and *United Technologies* cases make clear that the fact that the first–filed complaint seeks only declaratory relief is relevant to determining if it constitutes an anticipatory action intended to beat the defendant to the courthouse.

1    entered his appearance.  The fact that Hansen's attorney in the Pennsylvania Action immediately

2    replaced the attorney who prepared and filed the cursory Complaint in this action further suggests

3    that Hansen rushed to file this suit before CentiMark filed suit in Pennsylvania.[4]

4        **2.**    **Principles of Judicial Economy Require that the Parties' Entire
     Dispute be Resolved in the Pennsylvania Action**

5

6           Principles of "[w]ise judicial administration, giving rise to conservation of judicial

7    resources and comprehensive disposition of litigation," further prevent the application of the

8    first–filed rule in this instance.  *See Alltrade*, 946 F.2d at 627–28.  The dismissal of this case will

9    result in the parties' entire dispute being resolved in a single forum.  If the Court exercises its

10   jurisdiction, however, multiple actions will necessarily result.  The obvious efficiencies

11   associated with resolving the entire dispute in a single forum preclude the application of the first–

12   filed rule.  *Schmitt v. JD Edwards World Solutions Co.*, No. C01–1099–VRW, 2001 WL 590039,

13   at *3 (N.D. May 18, 2001) (rejecting the first–filed rule because the company's lawsuit would

14   resolve not only the limited issue of the enforceability of the non–competition provision, but also

15   the additional issues involving the improper disclosure of trade secrets).

16          Only once in his 17–page Opposition, in a footnote, does Hansen even implicitly

17   acknowledge that denying the Motion will result in two separate actions instead of a single

18   lawsuit.  Hansen states only that, because co–conspirators are not indispensable parties,

19   CentiMark is not required to pursue its conspiracy claim against Hansen, Vitek, and Tecta in the

20   same court.  *See* Opposition, p. 10 n.7.  This statement is a non sequitur.  The question is not if

21   CentiMark's conspiracy claim would be subject to dismissal for the failure to join indispensable

22   parties if CentiMark elected not to join all co–conspirators in a single action.  CentiMark has in

23

---

[4] In the event that this Court gives credence to Hansen's purported communications with various attorneys regarding his legal rights, CentiMark respectfully requests the opportunity to take discovery on the issue.  Despite Hansen's assertion to the contrary, he has clearly waived the attorney–client privilege with respect to the matters addressed in the Opposition and his declaration by disclosing his communications with counsel and affirmatively placing their substance at issue.  *McMorgan & Co. v. First California Mortgage Co.*, 931 F. Supp. 703, 708 (N.D. Cal. 1996) (the doctrine of limited/selected waiver does not apply in the Ninth Circuit, so the privilege is waived as to all parties once a privileged matter is disclosed); *see also Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) (placing the advice of counsel at issue is a waiver because the attorney–client privilege cannot be used as both a sword and a shield).  CentiMark should be permitted to discover the identities of the attorneys with whom Hansen consulted, the timing of each consultation, and the substance of each consultation to determine if the statements in Hansen's declaration are accurate.

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, California 94111-
3492

- 9 -

REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS - CASE NO. C-08-2611-SI

1    fact sued all three co–conspirators in Pennsylvania.  Instead, the issue is if resolving the entire

2    dispute will be more efficiently and effectively handled in the Pennsylvania Action in which all

3    co–conspirators are parties.[5]

4         In addition, the fact that the second–filed action has progressed further than the first is a

5    critical factor militating against applying the first–filed rule.  In *Mediostream, Inc. v. Priddis*

6    *Music, Inc.,* No. C07–2127–PJH, 2007 WL 2790688 (N.D. Cal. Sept. 24, 1007), this Court

7    considered the fact that the second–filed action had progressed through injunction proceedings in

8    refusing to apply the first–filed rule.  *Id.* *4 ("Mediostream does not dispute that the Nashville

9    action has proceeded much further than this action; mediation is occurring in Nashville (which

10   will likely result in a stipulated injunction), and a preliminary injunction motion was already filed

11   before that court."); *see also Guthy–Renker*, 179 F.R.D. at 270 ("when the later–filed action has

12   progressed further, efficiency considerations disfavor application of the rule.").

13        Hansen ignores the undisputed fact that the Pennsylvania Action has progressed much

14   further than this action, and instead misrepresents the activities that have occurred in that action.

15   Hansen deceptively states that CentiMark sought an *ex parte* temporary restraining order ("TRO")

16   in the Pennsylvania Action, which the court denied on two occasions.  Opposition, pp. 1, 5.  At no

17   time did CentiMark seek an *ex parte* TRO.  When CentiMark clarified that it was not seeking an

18   *ex parte* TRO, the court promptly scheduled a hearing on the TRO with notice for May 27, 2008

19   and ordered the parties to submits proposed findings by May 23, 2008.  Contrary to Hansen's

20   contention, the court was prepared to rule on the motion for TRO.

21        That ruling was not necessary, however.  All parties in the Pennsylvania Action

22   subsequently negotiated and stipulated to a mutually–agreeable interim Consent Order to govern

23   their conduct until the court conducts an injunction hearing.  The Pennsylvania court has entered

24   the Consent Order, entered an order requiring them to preserve evidence, and established an

---

[5] In the footnote, Hansen asserts that this Court has invoked the first–filed rule to dismiss a conspiracy claim against one conspirator even though the claims against the co–conspirators remained.  Opposition, p. 10 n.7 (citing *Grumman Sys. Support Corp. v. Data General Corp.*, 125 F.R.D. 160 (N.D. 1988)).  Hansen misconstrues the Court's ruling.  In *Grumman*, the parties and issues in the California and Massachusetts actions overlapped but were not substantially similar, so it was impossible to resolve all of the issues in a single lawsuit.  *Grumman*, 125 F.R.D. at 161, 164–65. While the Court dismissed one claim so that it could be brought in Massachusetts, it made clear that the basis for doing so involved counterclaim issues, *not* the first–filed rule and its concern for judicial efficiencies.  *Id.* at 164 (stating "The status of the first–filed action is irrelevant.").

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, California 94111-
3492

- 10 -

REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS - CASE NO. C-08-2611-SI

1    expedited discovery schedule.  To date, the parties have exchanged approximately a dozen

2    separate written discovery requests and/or responses, and have begun producing documents.[6]  In

3    contrast, no injunction, discovery, or other proceedings have taken place in this Court.  The fact

4    that the Pennsylvania Action has progressed so much further than this action also weights heavily

5    in favor of proceeding in Pennsylvania instead of this more limited and less developed action.

6        Finally, Hansen's contention that his dispute with CentiMark is wholly unrelated to

7    Pennsylvania is baseless.  *See* Opposition, pp. 2, 10, 16.  Hansen signed a written employment

8    agreement with CentiMark, a Pennsylvania company, which was expressly governed by

9    Pennsylvania law.  *See* Memorandum of Law in Opposition to Defendants' Motion to Dismiss in

10   the Pennsylvania Action, a copy of which is attached hereto as Exhibit D, at pp. 18–20.[7]

11   Hansen's responsibilities required him to interact with CentiMark in Pennsylvania on a routine, if

12   not daily, basis in order to perform his job.  *Id.*  It is that very agreement that CentiMark seeks to

13   enforce in the Pennsylvania Action.  In addition, CentiMark seeks to enforce the protections that

14   its trade secrets are afforded under common law.  Hansen obtained those very trade secrets from

15   CentiMark's computer servers located in Pennsylvania.  *Id.* at p. 19.  The crux of CentiMark's

16   dispute with Hansen involves activities in Pennsylvania.

17      **C.**    **The Court Has the Power to Dismiss, Stay, or Transfer This Action**

18       Hansen's contention that this Court must remand the case to state court if it elects not to

19

20   [6] Hansen's failure to even mention the stipulated Consent Order is particularly disturbing, particularly in light of his
     contention that CentiMark's attempts to obtain a TRO were denied.  As is evident, Hansen's description of the
21   activities that have taken place in the Pennsylvania Action in the Opposition is shockingly disingenuous.

     [7] Hansen's argument that a Pennsylvania court will ignore the Employment Agreement's choice of law provision, and
22   apply California law, is similarly misguided.  *See* Opposition, pp. 13–14.  In the cases that Hansen cites, the courts
     applied California law only in restrictive covenant cases which did not involve trade secrets or otherwise involved
23   only California sales activities.  *See General Video Corp. v. Soule*, No. Civ.A. 99–CV–5117, 2000 WL 328118, at
     **8–10 (E.D. Pa. Mar. 27, 2000) (stating in dicta, after determining that defendant was not competing with his
24   former employer, that California law would apply because *both* the defendant and his new company were in
     California); *Cottman Transmission Sys., Inc. v. Melody*, 851 F. Supp. 660, 671 (E.D. Pa. 1997) (applying California
25   law in a franchise action that did not involve trade secret claims).  Many courts have applied the parties' chosen law,
     rejecting a California employee's contention that the California statute addressing restrictive covenants requires the
     application of California law, in non–compete cases in which the employee is alleged to have misappropriated trade
26   secrets obtained from a state other than California.  *See, e.g., Estee Lauder Cos. Inc. v. Batra*, 430 F. Supp.2d 158,
     170–73 (S.D.N.Y. 2006) (applying chosen New York law to non–compete agreement of California employee whose
27   responsibilities extended nationwide); *Lowry Computer Prods., Inc. v. Head*, 984 F. Supp. 1111, 1113–15 (E.D.
     Mich 1997) (applying chosen Michigan law to non–compete agreement of California employee with alleged access
     to trade secrets).  Because this case involves trade secrets which Hansen obtained from Pennsylvania, utilized across
28   the country, and has the potential to disclose to Tecta in Illinois, no basis exists to ignore the Pennsylvania choice of
     law provision and apply California law.

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, California 94111-
3492

- 11 -
REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS - CASE NO. C-08-2611-SI

1    exercise jurisdiction is utterly specious. It is well established that, when parallel ***federal court***

2    actions exist, the court can dismiss, stay, or transfer the first–filed declaratory judgment action

3    pending before it – even if that case was originally filed in state court. Not a single one of the

4    cases that Hansen cites in his Opposition suggests otherwise.

5          The cases that Hansen cites are the progeny of the Supreme Court's ruling, in *Brillhart v.*

6    *Excess Insurance Company of America*, 316 U.S. 491 (1942), that federal courts should avoid

7    needless determination of state law issues that are best resolved by the state court. For example,

8    this Court cited *Brillhart* in remanding a case to state court in San Diego because a parallel action

9    was pending in state court in San Francisco which would address the state–law issues in dispute.

10   *See Charter Oak Fire Ins. Co. v. American Home Assurance Co.*, No. C06–2779–MMC, 2006

11   WL 3050863, at **4, 7 (N.D. Cal. Oct. 25, 2006) (stating "[i]f there are parallel state proceedings

12   pending at the time the federal declaratory judgment is filed, there is a presumption that the entire

13   suit should be heard in state court.") (internal quotation and citation omitted). The Court

14   expressly referenced the possibility that venue could be transferred so that both actions would be

15   resolved by the state court in San Francisco. *Id.* at *7.[8]

16         The remaining cases that Hansen cites did not even involve a parallel lawsuit in state

17   court. Instead, the federal courts determined that remand was proper because the cases involved

18   unique state law issues that the state courts were best equipped to resolve. For example, in

19   *Golden Eagle Insurance Company v. Travellers Company*, 103 F.3d 750 (9th Cir. 1996), the

20   Ninth Circuit held that a parallel proceeding is not a prerequisite, and a federal court may decline

21   to exercise jurisdiction if "the action belongs in state rather than federal court." *Id.* at 754

22   (internal quotation and citation omitted). The reason that remand is appropriate in such instances

23   is to permit the state court to address the unique state laws at issue in the case. *Id.*[9]

---

24   [8] In the South Carolina case upon which Hansen relies, the court similarly remanded the action because a parallel

25   state court action was pending and the state court had a much stronger interest in resolving the state law issues in
     dispute. *Hyrne v. Allstate Ins. Co.*, No. CA 2:06–CV–0584, 2006 WL 1889179, at *3 (D.S.C. July 7, 2006)

26   ("Because plaintiffs have litigation pending in a related state case, any decision this court makes regarding UIM
     coverage could potentially create an unnecessary entanglement between state and federal court.").

27   [9] All of the remaining cases that Hansen cites remanded the actions to state court ***not*** because federal courts lack

28   authority to dismiss a removed action, but instead because the state law issues in dispute made the state courts the
     most effective and efficient jurisdictions to resolve the cases. *See Del Suppo, Inc. v. Nautilus Ins. Co.*, Civil Action
     No. 07–952, 2007 WL 2345287, at *3 (W.D. Pa. Aug. 16, 2007) (remanding to state court because the dispute

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, California 94111-
3492

REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS - CASE NO. C-08-2611-SI

1     In short, Hansen has not identified a single case involving the first–filed rule in which a

2     federal court determined that it should not entertain an anticipatory declaratory judgment action

3     because the parties entire dispute could be more quickly and efficiently resolved in a different

4     federal court, but nevertheless remanded the declaratory judgment action to state court.  He

5     cannot do so.  Such an absurd result would be inconsistent with the desire to avoid duplicative

6     litigation.  If this Court determines that parties' entire dispute can be more effectively and

7     efficiently resolved in the Pennsylvania Action, remanding the case to a state court in California

8     would be nonsensical.

9     For this reason, this Court has made clear in its decisions involving the applicability of the

10    first–filed rule – including in *Inherent.com*, a case upon which Hansen relies – that it has the

11    authority to dismiss, stay, or transfer an action that it was originally filed in California state court

12    and removed to federal court.  *See Schmitt*, 2001 WL 590039, at *3 (dismissing the first–filed

13    declaratory judgment action, even though it had originally been filed in California state court, so

14    that the entire dispute could be resolved in the defendant's action in Connecticut); *Inherent.com*,

15    420 F. Supp.2d at 1097, 1101 (declining to exercise jurisdiction, and transferring the case to New

16    Jersey, even though the action had originally been filed in California state court).  Hansen's

17    argument that this Court's only recourse is to remand the case to state court is meritless.

18    DATED:      August 8, 2008                    Respectfully submitted,

19                                                 SQUIRE, SANDERS & DEMPSEY L.L.P.

20                                                 By:____*/s/ David A. Gabianelli*_____
                                                         David A. Gabianelli
21                                                 Attorneys for Defendant
                                                 CENTIMARK CORPORATION
22    OF COUNSEL:
      Peter S. Russ / Gregory J. Krock
23    Buchanan Ingersoll & Rooney
      One Oxford Centre, 301 Grant St., 20th Floor
24    Pittsburgh, PA 15219-1410
      Telephone:   +1.412.562.8800/Facsimile:   +1.412.562.1041
25

26    involved well–settled insurance law best resolved by the state court); *Warner v. Frontier Ins. Co.*, 288 F. Supp.2d
      127, 132 (D.N.H. 2003) (remanding to state court because the dispute involved unsettled dispositive issues of state
27    law); *McDowell Oil Serv., Inc. v. Interstate Fire & Caus. Co.*, 817 F. Supp. 538, 545–46 (M.D. Pa. 1993) (remanding
      to state court that had recently addressed similar issues because "[l]itigating those claims before a state court judge
28    already intimately familiar with the intricacies of these much litigated underlying actions will allow for a much more
      expeditious resolution of this action.").

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, California 94111-
3492

- 13 -
REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS - CASE NO. C-08-2611-SI

# EXHIBIT A



## MEMO

APR 2 7 2005

**To:**      **CentiMark Associates**

**From:**    **Tim Dunlap**

**Date:**    **April 13, 2005**

**Re:**      **CentiMark's Non-Compete Employment Contracts**

CentiMark Corporation currently utilizes and looks to continue to enforce its "non-compete" Employment Agreement that you have executed. The purpose of this agreement is (i) to protect CentiMark from unfair competition and (ii) to preserve our confidential information, customer base, and goodwill that each of us works so hard to develop and build every day. We should all be committed to making sure these agreements are enforced as they help CentiMark protect its assets and keep us as a strong, viable employer. You have executed an Employment Agreement with CentiMark Corporation and CentiMark welcomes and appreciates your commitment and service to it. Centimark has worked diligently to become a leader in the industry and must demand enforcement of its Employment Agreements to remain in this position for both the future of the company and its employees.

In recent months, a couple of ex-CentiMark employees elected to disregard their obligations under the terms of this contract, and CentiMark was forced to sue those individuals in court to maintain CentiMark's rights. CentiMark has been successful in this endeavor which has resulted in the ex-CentiMark employees having not only to honor the terms of the Employment Agreement but also having to suffer the following expenses: (i) direct financial loss not only in the form of reimbursement to CentiMark but also in the form of legal fees, travel costs and time associated with obtaining legal defense; and (ii) intense pressure and negative stress of a lawsuit.

In efforts to protect CentiMark against those who may seek to reveal confidential information, directly solicit our current client base, and/or violate other aspects of the agreement, there is a strong commitment by the Executive Committee together with the Legal and Human Resources Departments to aggressively pursue anyone who violates the terms of his/her Employment Agreement. An aggressive practice to recover financial retribution, court costs and legal fees will be sought as part of any suit involving a violation of a CentiMark Employment Agreement.

This is not intended as any offense of wrongdoing upon you. CentiMark is committed to maintaining a good and respectful employment relationship with its employees and should the employment relationship ever cease for any reason whatsoever, CentiMark wishes success to



anyone with other employment, except should it interfere with the business of Centimark and/or violate any terms that exist under CentiMark's Employment Agreement.

In conclusion, I want to be sure that everyone understands CentiMark's position regarding CentiMark's Employment Agreement. If you have any questions about the contract or desire clarification of the terms associated with the agreement, please feel free to contact Barb Felton in our Human Resources Department. We ask all questions be submitted in writing to Barb via e-mail at barb.felton@centimark.com so we can provide you with a proper response.

I have read and understand this foregoing memorandum issued by Tim Dunlap and understand that I may direct any questions that I have about this memorandum to Barb Felton.

| Name: | ᚱᴀᴛʀɪᴄᴄ ʜᴀɴꜱᴇɴ | Date: | 4-19-2005 |
| (Signature) | | | |

**EXHIBIT B**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CENTIMARK CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No  08–0593 |
| v. | ) | |
| | ) | |
| TECTA AMERICA CORP., VINCENT J. | ) | |
| VITEK, and PATRICK J  HANSEN, | ) | |
| | ) | |
| Defendants | ) | |

### DECLARATION OF BARBARA FELTON

1    I, BARBARA FELTON, am employed by CentiMark Corporation ("CentiMark") as the Vice President of Human Resources  I have been employed by CentiMark since August, 1987 and have held my present position since September, 2004  I presently live in Canonsburg, Pennsylvania and work out of CentiMark's corporate offices located in Canonsburg, Pennsylvania

2    I am responsible for employee relations issues for CentiMark  Such matters include, but are not limited to, overseeing personnel matters, maintaining personnel records which are housed in CentiMark's Canonsburg, Pennsylvania offices, preparing employment agreements, overseeing EEO Matters and assisting with various legal compliance matters

3    I prepared the employment agreements for both Vincent J. Vitek ("Vitek") and Patrick J  Hansen ("Hansen")  Both agreements were accepted and executed on behalf of CentiMark at CentiMark's corporate offices located in Pennsylvania

4.    I conducted telephonic exit interviews from my Canonsburg, Pennsylvania offices with both Vitek and Hansen after they announced that they were terminating their employment with CentiMark  They both acknowledged to me that they were aware of the non-compete

provisions which were included in their CentiMark employment agreements and Hansen

specifically told me that their new employer, Tecta America, was likewise aware of these

contract provisions.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge

Dated:        July 3, 2008        *Barbara Felton*
                                   Barbara Felton

**EXHIBIT C**

David A. Gabianelli (State Bar No. 158170)
Andrew L. Chang (State Bar No. 222309)
Squire, Sanders & Dempsey L.L.P.
One Maritime Plaza, Suite 300
San Francisco, CA 94111-3492
Telephone:  +1.415.954.0200
Facsimile:  +1.415.393.9887
Email:      dgabianelli@ssd.com
Email:      achang@ssd.com

Attorneys for Defendant
CENTIMARK CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PATRICK HANSEN,

       Plaintiff,

  vs.

CENTIMARK CORPORATION,

       Defendant.

Case No.  C–08–2611–SI

**DECLARATION OF TIMOTHY M. DUNLAP**

1.     I, TIMOTHY M. DUNLAP, am the President and COO of CentiMark Corporation ("CentiMark").  I presently live in Peters Township, Pennsylvania and work out of CentiMark's offices located in Canonsburg, Pennsylvania.

2.     I participated on a telephone call with Mark Santacrose, the President and CEO of Tecta America Corp. ("Tecta"), on April 22, 2008.  CentiMark initiated the call in response to Mr. Santacrose's communications regarding Tecta's hiring of Patrick Hansen ("Hansen") and Vincent Vitek ("Vitek"), two individuals who had resigned from CentiMark on April 21, 2008.

3.     Mr. Santacrose expressed the desire to resolve the parties' dispute amicably without the need for court intervention.

4.    CentiMark declined to entertain such a possibility, and instead stated that it would immediately pursue litigation against Tecta, Hansen, and Vitek.  CentiMark further stated the matter was so significant that CentiMark is willing to incur the significant litigation fees and costs necessary to obtain a court order which protects CentiMark's interests.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge

Dated:  August 8, 2008

Timothy M. Dunlap

**EXHIBIT D**

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

---

Civil Action No. 08–0593

Judge William L. Standish
Magistrate Judge Francis X. Caiazza

---

CENTIMARK CORPORATION

Plaintiffs

v.

TECTA AMERICA CORP., VINCENT J.
VITEK, and PATRICK J. HANSEN,

Defendants.

---

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

---

Peter S. Russ
Pa. I.D. No. 58284
Gregory J. Krock
Pa. I.D. No. 78308

**BUCHANAN INGERSOLL
& ROONEY** PC
One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA 15219–1410
(412) 562–1416/3983

Counsel for Plaintiff, **CentiMark Corporation**

## I.     **INTRODUCTION**

The Motion to Dismiss fails for a multitude of independent reasons.[1] First, Defendants have waived the right to challenge personal jurisdiction and venue in this Court by participating in this case. Defendants sought and obtained an order requiring Plaintiff CentiMark Corporation ("CentiMark") to preserve relevant documents, consented to the entry of an interim temporary restraining order, negotiated an agreed–upon expedited discovery schedule that the Court entered, and moved for the *pro hac vice* admission of their counsel. The law is clear that, having engaged in these activities, they cannot now avoid this Court's jurisdiction.

Second, personal jurisdiction and venue would exist even if Defendants had not waived their right to raise jurisdictional defenses. Eschewing the option of working for local enterprises, both Vitek and Hansen knowingly reached out to Pennsylvania and formed continuous employment relationships with CentiMark, a Pennsylvania corporation, for the manifest benefits that would derive from an association with such a nationwide company. Their employment agreements, which CentiMark signed (and therefore took effect) in Pennsylvania, are expressly governed by Pennsylvania law. Both Vitek and Hansen regularly communicated with CentiMark personnel in Pennsylvania in performing their sales functions. In fact, Vitek and Hansen used CentiMark's computer servers in Pennsylvania on a ***daily basis*** to access CentiMark's proprietary customer data, proposals and contracts, pricing information, market intelligence and statistics, and marketing strategies – the very trade secrets that CentiMark is attempting to prevent all Defendants, including Tecta, from wrongfully using to their advantage.

Finally, no basis exists to transfer venue. Defendants cite no authority for the proposition that this Court is permitted to split CentiMark's action in half, and transfer one–half to California

---

[1] The Motion to Dismiss was filed on behalf of Defendants Tecta America Corp. ("Tecta"), Patrick J. Hansen ("Hansen"), and Vincent J. Vitek ("Vitek"). For ease of reference, the single–page Motion and Memorandum of Law in Support of Defendants' Motion to dismiss are collectively identified herein as the "Motion."

and the second half to Illinois. Nor do they explain how such a result will be more convenient for the witnesses, and more efficient, than adjudicating CentiMark's action in this Court. Defendants cannot do so. Splitting the action into separate proceedings would result in a considerable duplication of work by the parties and judicial system. Testimony from the same witnesses – including Hansen, Vitek, and representatives of CentiMark and Tecta – would be required in both proceedings. The same documents, many of which are located in Pennsylvania, would similarly be required at both proceedings. Many of the same legal issues would need to be resolved, creating the possibility of inconsistent rulings. Defendants' contention that it would be more convenient to split this action into two proceedings to be resolved hundreds of miles apart is utterly specious.

## II.    FACTUAL BACKGROUND

When the defendant objects to personal jurisdiction, the plaintiff must only make a prima facie showing that jurisdiction exists. *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 316 (3d Cir. 2007). The court must assume that all of the plaintiff's allegations are true, and resolve all factual disputes in plaintiff's favor, in the jurisdictional analysis. *Id.*

### A.    CentiMark's Business

CentiMark is a Pennsylvania corporation with its principal place of business located in Canonsburg, Pennsylvania. Verified Complaint, ¶ 6. CentiMark markets, sells, installs, and services roofs and roofing systems to commercial, institutional, and industrial customers throughout the United States and Canada. *Id.* at ¶ 15. It operates out of approximately 50 North American offices. *Id.*

Nearly twenty (20) years ago, CentiMark created a national sales force – known as its National Accounts Group – to complement its local sales force. Members of the National Accounts Group manage the relationships with CentiMark's largest customers, some of whom

2

own hundreds or even thousands of commercial facilities throughout the United States. *Id* at ¶ 20.

**B.    Hansen's and Vitek's Contacts with Pennsylvania**

Hansen and Vitek both signed employment agreements which established a continuous relationship with CentiMark. *See* Employment Agreement ("Vitek Agreement") and Employment and Noncompetition Agreement ("Hansen Agreement"), copies of which are attached to the Verified Complaint as Exhibits A and B, respectively. CentiMark prepared the employment agreements in Pennsylvania, and both agreements were accepted and executed on behalf of CentiMark in Pennsylvania. *See* Declaration of Barbara Felton ("Felton Aff."), a copy of which is attached hereto as Exhibit A, at ¶ 3.

Vitek agreed that Pennsylvania law would govern his agreement, irrevocably submitted to the personal jurisdiction of this Court, and waived any objection to venue in this Court. Vitek Agreement, Articles 6.05, 6.06, and 6.08. Hansen also agreed that Pennsylvania law would govern his agreement. Hansen Agreement, Article 4.3.

The salary payments that Vitek and Hansen received during the course of their employment originated from CentiMark's headquarters in Pennsylvania. Declaration of Laura Kickbusch ("Kickbusch Aff."), a copy of which is attached hereto as Exhibit B, at ¶ 4. All bonus compensation paid to Vitek and Hansen were determined and finally approved by CentiMark personnel located in Pennsylvania. *Id.* at ¶ 5. Both Vitek and Hansen participated in CentiMark's employee welfare plans, 401(k) Plan, and ESOP, all of which CentiMark administered in Pennsylvania. *Id.* at ¶¶ 3, 6. Hansen and Vitek both had telephone conversations with CentiMark personnel in Pennsylvania regarding their participation in these plans. *Id.* at ¶¶ 7–8.

Vitek and Hansen were required to submit appropriate documentation on a weekly basis for expense reimbursement to CentiMark's headquarters in Pennsylvania. Declaration of Sherrie Neal ("Neal Aff."), a copy of which is attached hereto as Exhibit C, at ¶¶ 2–3. CentiMark personnel in Pennsylvania reviewed and paid these requests. *Id.* at ¶¶ 4–5. Both Hansen and Vitek regularly e–mailed or telephoned CentiMark personnel in Pittsburgh to request information concerning the status of any expense reimbursement requests or to request payments in support of their CentiMark marketing activities. *Id.* at ¶ 6.

The invoices and payments processed for the customers of Vitek and Hansen were also processed by CentiMark in Pennsylvania. Declaration of Anthony DeCecco ("DeCecco Aff."), a copy of which is attached hereto as Exhibit D, at ¶ 3. The credit investigation, and collections efforts, for customers of Vitek and Hansen were also conducted by CentiMark personnel in Pennsylvania. *Id.* at ¶¶ 4–5. Vitek and Hansen periodically communicated CentiMark personnel in Pennsylvania on issues related to customer accounts, the collection of delinquent accounts, customer credit histories, and related credit issues. *Id.* at ¶ 7.

Many of the significant contracts and proposals that Vitek and Tecta prepared were reviewed, revised, and approved by CentiMark personnel and legal counsel in Pennsylvania. Declaration of Cheryl Welch ("Welch Aff."), a copy of which is attached hereto as Exhibit E, at ¶¶ 2–6. Hansen had frequent communications with personnel in Pennsylvania regarding the contracts that he was negotiating, all of which were subject to final approval by CentiMark's senior management in Pennsylvania. *Id.* at ¶¶ 4, 6. Vitek had similar, but less frequent, communications in this regard. *Id.* The warranties that Vitek and Hansen included in the contracts that they negotiated, which constitute a material element of most commercial roofing

4

proposals, were analyzed, approved, and issued to customers (regardless of their location) from CentiMark's headquarters in Pennsylvania. DeCecco Aff., ¶ 6.

CentiMark's customer service representatives in Pittsburgh routinely assisted Vitek, Hansen, and their respective customers. Declaration of Christina Griffith ("Griffith Aff."), a copy of which is attached hereto as Exhibit F, at ¶¶ 1–4. The customer service representatives communicated with Hansen via e–mail or telephone approximately several times per week, and with Vitek several times per month. *Id.* at ¶¶ 5–6. These representatives provided direct assistance to Hansen's customers on an almost daily basis, and Vitek's customers on a regular but less frequent basis. *Id.* at ¶ 7.

CentiMark's primary data center – including its computer servers, hardware, and related software – is maintained, administered, and updated in its Pennsylvania headquarters. Declaration of Greg Wilson ("Wilson Aff."), a copy of which is attached hereto as Exhibit G at ¶ 2. Approximately 20 information technology professionals in Pennsylvania support these technology–related support services. *Id.* All e–mail communications that Vitek and Hansen generated using their business e–mail accounts, and all internet searches that they made from their computers, utilized CentiMark's computer servers located in Pennsylvania. *Id.* at ¶¶ 4–5.

The information that CentiMark maintained in its electronic databases located in Pennsylvania include customer data, customer proposals and contracts, customer credit histories, customer buying histories where available, pricing information, construction specifications, market intelligence and statistics, marketing strategies, customer purchasing patters, and other sensitive and critical data which are essential tools that CentiMark uses to obtain and retain customers. *Id.* at ¶¶ 6, 9. Vitek and Hansen also regularly accessed CentiMark's extranet for the purpose of receiving and analyzing prospective and historic business transactions. *Id* at ¶ 8.

Vitek and Hansen accessed this customer and market information on a regular basis in support of

their efforts to maintain and/or expand CentiMark's customer base. *Id* at ¶ 7.

CentiMark's records reflect that both Hansen and Vitek accessed their e–mail accounts

multiple times daily. *Id* at ¶ 8. For example, Hansen utilized his Blackberry device to access his

CentiMark e–mail account in Pennsylvania approximately *572 times* from March 16, 2008 to

April 15, 2008. *Id*

Hansen visited CentiMark's office on two separate occasions, once to meet with other

employees and another time to receive training. Declaration of Patrick J. Hansen ("Hansen

Decl."), ¶ 15. Vitek visited CentiMark's offices in Pennsylvania approximately twice a year for

many years. Declaration of Vincent J. Vitek ("Vitek Decl."), ¶ 8. During the six months before

he resigned, however, Vitek attended meetings in Pennsylvania on five or six separate occasions.

*Id*. at ¶ 9.

CentiMark personnel in Pennsylvania conducted telephonic exit interviews with both

Vitek and Hansen after they announced that they were terminating their employment with

CentiMark. Felton Aff., ¶ 4. They both acknowledged that they were aware of the non–compete

provisions, and Hansen stated that Tecta was also aware of these contract provisions. *Id*.

**C.     <u>Tecta's Contacts with Pennsylvania</u>**

As set forth in detail on its internet website, Tecta is a single national company which

operates its subsidiaries as mere departments or locations. *See* Tecta's website, excerpts of

which are collectively attached hereto as Exhibit H. Nowhere in its website does Tecta refer to

its subsidiaries as separate corporations. *Id*. Instead, it refers to those entities as Tecta's

divisions, locations, or operating units. *Id* Tecta even claims the offices and workers of its

"divisions" as its own, stating: "With over 50 locations and over 3,000 qualified roofing

professionals nationwide, Tecta America has harnessed the strengths and resources of the nation's strongest roofing contractors into one company." *Id.* Tecta similarly describes the uniform roofing services provided as its services, rather than those of its subsidiaries. *Id.*

Tecta's president, Mark Santacrose, has expressly stated that Tecta is a single company comprised of operating divisions. In the trade journal *Roofing/Siding/Insulation*, Mr. Santacrose publicly stated: "We are a single company with a number of different operating locations that share ownership." *See* RSI Top 100 and Michael Russo, "Tecta Family Grows Bigger, Better," *Roofing/Siding/Insulation,* October 2007, copies of which are attached hereto as Exhibit I.

Tecta's operating division known as Potteiger–Raintree, Inc. maintains an office in Glen Rock, Pennsylvania. *See* Potteiger–Raintree, Inc.'s internet website, excerpts of which are attached hereto as Exhibit J. This operating division has performed, and continues to perform, roofing services in Pennsylvania. *Id.* While the operating division has its own website, that site has the Tecta name and logo, mirrors the Tecta site, and refers to itself as a division as Tecta. *Id.*

Tecta representatives traveled to CentiMark's headquarters in Pennsylvania to meet with CentiMark about a potential transaction, signed the a confidentiality agreement with CentiMark (the "Tecta Agreement") to enable the parties to explore such a transaction, exchanged correspondence with CentiMark in Pennsylvania, and participated in a telephone conference with CentiMark in Pennsylvania. After Vitek and Hansen resigned, Tecta's president telephoned CentiMark in Pennsylvania to discuss Tecta's decision to hire them. A CentiMark representative in Pennsylvania responded via e–mail that it would pursue legal action to enforce its rights.

### III.    **ARGUMENT**

**A.**    **Defendants Have Waived the Right to Challenge Personal Jurisdiction and Venue**

Defendants can waive their right to assert preliminary defenses, including lack of personal jurisdiction and improper venue, *before* their responsive pleadings are due. *Wyrough &*

*Loser, Inc v Pelmor Labs, Inc*, 376 F.2d 543, 546 (3d Cir. 1967). These defenses are waived

when defendants voluntarily participate in the proceeding and/or ask the court to act on their

behalf. *Id* ; *George Washington Univ. v DIAD, Inc*, Civil Action No. 96–301, 1996 WL

470363, at *1 (D.D.C. Aug. 9, 1996)("If a party enters a case, makes no objection to [personal]

jurisdiction, and asks the court to act on its behalf in some substantive way, it will be held to

have waived further objection.")(citation omitted).

 In *Wyrough*, the Third Circuit held that a week is sufficient time for a defendant to

determine that it may possess jurisdictional defenses, and move to continue any scheduled

deadline in order to preserve those defenses. *Wyrough*, 376 F.2d at 547. The court explained:

> We concede that a period of one week is a short time to adequately prepare a
> proper defense; however, we note that no continuance was requested prior to
> [participating in the case]. It seems to us that within this period the defendant
> could sufficiently apprise itself of the jurisdictional questions so as to move the
> court to continue the hearing until it had further time to explore these matters. In
> this way the court would be alerted to the jurisdictional issues without requiring
> the defendant to place itself in a strained position ....

*Id.* Because the plaintiff and court invested time and resources in moving the case forward

before the defendant finally raised its jurisdictional defenses, the Third Circuit held that it such

defenses had been waived. *Id.*

 Similarly, in *Marquest Medical Products, Inc. v. Emde Corporation*, 496 F. Supp. 1242

(D. Col. 1980), the court held that the defendant waived its jurisdictional defenses by stipulating

to the entry of an order, obtaining several extensions to file a responsive pleading, and waiting

six weeks before filing its motion to dismiss. *Id.* at 1245. The stipulated order not only

governed the defendant's actions, but – at the defendant's request – also restrained the plaintiff's

actions. *Id.* Accordingly, the court denied the defendant's jurisdiction–based motion to dismiss.

*See also DIAD*, 1996 WL 470363, at *1 (defendant waived objections to jurisdiction and venue

by filing, *inter alia*, motions regarding the filing of documents under seal and to withdraw as counsel); *Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garmet & Allied Indus. Fund*, No. C–90–310, 1990 WL 383798, at *1 (D.N.H. Nov. 20, 1990)(defendant submitted to the court's jurisdiction by filing motions for the *pro hac vice* admission of its out–of–state counsel and requesting hearings on the plaintiff's motion), *aff'd*, 967 F.2d 688 (1st Cir. 1992).

Defendants here have similarly waived their jurisdictional defenses through their active participation in this case. They filed the Motion approximately five weeks after CentiMark initiated the action, and at least four weeks after their counsel received a copy of the Verified Complaint. Before filing the Motion, Defendants engaged in the following extensive activities to advance the proceedings on the merits in this Court:

- during a telephonic conference with the Magistrate Judge on May 16, 2008, Defendants objected to the fact that proposed order attached to CentiMark's motion to preserve documents was unilateral in nature and requested that any relief entered be bilateral;

- prepared and submitted an alterative order on May 19, 2008 which required all parties (including CentiMark) to preserve documents;

- the Court entered Defendants' proposed order on May 20, 2008, noting that it was entered upon consent of all parties;

- authorized the filing of the stipulation for the entry of an interim consent temporary restraining order on May 22, 2008, which resulted in the Court's entry of a Consent Order the following day;

- participated on a telephone call with counsel for CentiMark on May 29, 2008 to discuss a mutually–agreeable expedited discovery schedule. Based in part on his vacation schedule, counsel for Defendants proposed that the parties be afforded one month to exchange written discovery and one month to conduct depositions;

- participated in a telephonic conference with the Magistrate Judge on May 30, 2008 to discuss the parties' proposed joint discovery schedule. Counsel for Defendants represented that they would serve discovery requests within a number of days; and

- moved for the *pro hac vice* admission of their out–of–state counsel. The Court granted this motion on June 2, 2008.

Defendants have recently asserted that the parties agreed in the Consent Order that Defendants' participation in the case would not impact their right to assert a defense based on the lack of jurisdiction. *See* Memorandum of Law in Support of Defendants' Motion to Stay, p. 3 and n.3. This assertion is incorrect. The Consent Order states only that "***this Order*** is being made without prejudice to any arguments or legal positions in favor of or in opposition to the enforceability of any agreements between the parties or any claims or defenses in this action ...." Consent Order, ¶ 7 (emphasis added). Nowhere in the Consent Order did the parties agree, or the Court state, that Defendant's prior or subsequent actions in this case would not constitute a waiver of the right to challenge jurisdiction and venue in this Court. Furthermore, it is apparent that Paragraph 7 of the Consent Order – which does not mention personal jurisdiction – was intended to preserve claims/defenses to be addressed at the preliminary injunction hearing in this case, and not to enable Defendants to avoid the hearing altogether.

Not once during this month–long time period did Defendants definitively advise CentiMark or the Court that they intended to attack jurisdiction and venue in this Court.[2] Instead, after commenting that they believed that certain of the Defendants might have jurisdictional defenses, Defendants sought an order requiring CentiMark to preserve records, stipulated to an interim consent order, repeatedly participated in scheduling conferences, and moved for their counsel's *pro hac vice* admission. CentiMark and the Court invested time and effort in this case that could have been avoided, or at least deferred, had Defendants

---

[2] Counsel for Defendants stated that this Court may lack jurisdiction over Hansen, and that Vitek was also exploring such a defense, during the initial telephonic conference on May 16, 2008. Like the defendant in *Wyrough*, however, Defendants did not seek to stay further activity in order to assess and file a motion challenging jurisdiction. They elected to participate in the proceedings, and even asked the Court to enter orders on their behalf.

appropriately moved forward with their delayed defenses. Under these circumstances,

Defendants have waived their right to "walk away" from this Court's jurisdiction at this time.

**B.    Defendants are Subject to Personal Jurisdiction in this Court**

Even if Defendants had not waived their right to challenge jurisdiction at this time, their

Motion would still fail. This Court can lawfully exercise personal jurisdiction over all

Defendants.

**1.    Vitek Expressly Consented to Personal Jurisdiction and Venue**

Vitek expressly and irrevocably consented to both personal jurisdiction and venue in this

Court. Vitek Agreement, ¶¶ 6.06 and 6.08. Courts have continually recognized that, when a

party has consented to jurisdiction, the analysis of its contacts with the forum state is irrelevant

and unnecessary. *Provident Mut. Life Ins. Co. of Philadelphia v. Bickerstaff*, 818 F. Supp. 116,

118 (E.D. Pa. 1993). Instead, as the Supreme Court of the United States has directed, the forum

selection clause is prima facie valid and must be enforced unless the defendant proves that doing

so would be unreasonable. *M/S Bremen v. Zapata Off–Shore Co*, 407 U.S. 1, 18 (1972).

Defendants can only establish that the clause is unreasonable by making a "strong showing" that

(1) the agreed–upon forum is so gravely inconvenient that defendant will effectively be deprived

of its day in court or (2) the plaintiff procured the forum selection clause by fraud or

overreaching. *Id.* Vitek has not and cannot meet this steep burden.

Vitek has not alleged, let alone established, that requiring him to litigate in this Court is

so gravely inconvenient that he would effectively be denied his day in court. Vitek earned a

significant salary with CentiMark and can unquestionably pay any (nominal) increased cost

associated with litigating in Pennsylvania rather than Illinois. *See* Verified Complaint, ¶ 56

(Vitek's base salary, excluding bonus, was $118,000). More to the point, however, Vitek is being

represented by Tecta's counsel in this matter. CentiMark is informed that Tecta is paying the legal fees associated with Vitek's defense herein.[3]

Nor has Vitek made a strong showing that the forum selection clause was obtained through fraud or was overreaching. First, Vitek grossly mischaracterizes the court's holding in *Dentsply International, Inc. v. Benton*, 965 F. Supp. 574 (M.D. Pa. 1997). Vitek incorrectly implies that *Dentsply* stands for the proposition that a ***prospective*** employee's relationship with a prospective employer is so inherently unequal that forum selection clauses negotiated at the outset of an employment relationship are generally not enforced. Motion, p. 15. *Dentsply* actually involved a restrictive covenant which the employer required its existing employee to sign years into his employment or face dismissal. *Dentsply*, 965 F. Supp. at 575. It was the threat of termination from an *existing* job that rendered unequal the respective parties' bargaining power. *Id.* at 579–80. Within a year after authoring the *Dentsply* opinion, Judge Caldwell rejected a prospective employee's attempt to rely on that opinion to circumvent the terms of a contract signed at the inception of her employment with a Pennsylvania company:

> In *Dentsply*, we did refuse to enforce a forum selection clause in an employment agreement. However, in that case the employee was already in the job, one he had held with the company that had been acquired by his new employer. We concluded that the pressure to "preserve" a job a person already had rendered the employee–employer relationship so inherently unequal . . . . In doing so, we specifically distinguished cases like the instant one where agreements had been

---

[3] In reliance upon a Pennsylvania state court case, Vitek asserts that the forum selection clause is unreasonable because defending the action will cost less than the $36,500 in damages that he believes would be recoverable upon a default. *See* Motion, p. 16. This argument fails for at least four separate reasons. First, the governing federal law does not include this standard in its definition of an "unreasonable" forum selection clause. *See Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 877 (3d Cir. 1995)("In federal court, the effect to be given to a forum selection clause in diversity cases is determined by federal not state law."). Second, CentiMark also filed this action to obtain injunctive relief and *avoid* immeasurable damages. Under Vitek's argument, a court could never enforce a forum selection clause in an injunction action to avoid imminent damages that had not yet accrued. Third, CentiMark is entitled to recover damages in excess of $36,500 from Vitek. Fourth, Vitek has not asserted (let alone shown) that the cost of litigating in Pennsylvania will be any greater than in Illinois. Given the substantial nature of this case, Vitek would also incur (whether he or someone else is actually paying them) legal costs in excess of $36,500 to litigate this matter in Illinois.

executed "while the employee still had a choice to enter into the employment relationship."

*Behavioral Health Indus News, Inc. v. Lutz*, 24 F. Supp.2d 401, 402-03 (M.D. Pa. 1998)(citation omitted). Here, no unequal bargaining power existed because Vitek agreed to his contract nearly 18 years ago at the inception of his employment with CentiMark.

Second, Vitek strains to draw the implausible conclusion that CentiMark *must* have over reached to obtain the consent to jurisdiction and venue clauses because the Vitek Agreement contains *other* provisions which appear to favor CentiMark. Motion, p. 16. This assertion likewise fails. As an initial matter, Vitek must clearly establish that the specific clauses at issue – and not the contract itself or any other clause – were fraudulently obtained or violate public policy. *Dentsply*, 965 F. Supp. at 577 ("A party cannot contest the validity of a forum selection clause by questioning the enforceability of the entire contract. Instead, he must show that *the clause itself* was the product of fraud or coercion.")(emphasis added)(citation omitted). Vitek offers no evidence that his consent to Pennsylvania jurisdiction and venue clauses at issue were fraudulently obtained or violate public policy.

Moreover, Vitek cites no legal authority for his conclusory contention that the other provisions which he criticizes at this time (such as a notice of claim provisions and time limitation for asserting claims against CentiMark) are "offensive." Vitek's unsupported contention that the unrelated contract term providing that a CentiMark breach would not necessarily preclude it from otherwise enforcing the agreement is somehow "offensive" is without merit. Such provisions are common in agreements containing important restrictive covenants that must be enforced to avoid irreparable harm. Similarly, the provision in the Vitek Agreement providing that he consent to service via certified mail can hardly be attacked as somehow unconscionable. Service of process upon defendants who reside outside of

Pennsylvania by certified mail is *expressly authorized* under the laws of both Pennsylvania and this District. *See* Pa. R. Civ. P. 404(2)(2008); Fed. R. Civ. P. 4(e)(1)(2008)(authorizing service in the manner allowed by state law in the state where the district is located). Vitek's contention that CentiMark "overreached" by reserving a right that it already possessed is specious.

In short, Vitek expressly consented to jurisdiction and venue in this Court. He has not made, and cannot make, a strong showing (or any showing for that matter) that he will be effectively precluded from having his day in court if he is required to defend himself in Pennsylvania. Nor has he made a strong showing (or any showing for that matter) that CentiMark somehow acted fraudulently or overreached to secure the choice of jurisdiction and venue clauses. Vitek's motion to dismiss should therefore be denied.

2.    **This Court Has Specific Jurisdiction Over Both Vitek and Hansen**

Rule 4 of the Federal Rules of Civil Procedure authorizes district courts to exercise personal jurisdiction according to the law of the states in which they sit. Fed. R. Civ. P. 4(k)(2008); *O'Connor*, 496 F.3d at 316. The Pennsylvania legislative, through the Pennsylvania long–arm statute, has expressly provided for jurisdiction based upon the most minimum contact allowed under the Constitution of the United States. 42 Pa. Cons. Stat. Ann. § 5322(b)(2008). Personal jurisdiction therefore exists if defendants have minimum contacts with Pennsylvania such that requiring them to litigate in this forum does not offend traditional notions of fairness and justice. *O'Connor*, 496 F.3d at 316–17.

In *Burger King Corporation v. Rudzewicz*, 471 U.S. 462 (1985), the Supreme Court expressly held that a defendant–franchisee who never physically visited Florida was nonetheless subject to personal jurisdiction in Florida, the corporate headquarters for Burger King. *Id.* at 479–81. The Supreme Court explained:

Yet this franchise dispute grew directly out of "a contract which had a *substantial* connection with that State." Eschewing the option of operating an independent local enterprise, Rudzewicz deliberately "reach[ed] out beyond" Michigan and negotiated with a Florida corporation for the purchase of a long–term franchise and the manifold benefits that would derive from the affiliation with a nationwide organization. Upon approval, he entered into a carefully structured 20–year relationship that envisioned continuing and wide–reaching contacts with Burger King in Florida. . . . Rudzewicz' refusal to make the contractually required payments in Miami, *and his continued use of Burger King's trademarks and confidential business information after his termination, caused foreseeable injuries to the corporation in Florida.*

*Id.* at 479–80 (internal quotations omitted)(second emphasis added). The Supreme Court further

noted the importance of the contract's choice of Florida law provision, which "reinforced his

deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation

there." *Id.* at 481.

Pennsylvania courts have recognized that an employee's decision to enter into a

contractual relationship with a Pennsylvania company may in–and–of–itself create the necessary

contact to confer jurisdiction upon a Pennsylvania court. In *USPower Climate Control, Inc. v.*

*White*, No. Civ. A. 93–6663, 1994 WL 386341 (E.D. Pa. July 22, 1994) – a case involving the

breach of a covenant not to compete – the Eastern District of Pennsylvania held that it could

exercise personal jurisdiction over a defendant by virtue of his continuing contractual

relationship with a Pennsylvania corporation. *Id.* at ** 1–2. The court explained:

With respect to contractual obligations, parties who "reach out beyond one state and create continuing relationships and obligations with citizens of another state" may not complain if they are subjected to the other state's jurisdiction. . . . The Agreement creates a continuing business relationship whereby Plaintiff, a Pennsylvania corporation, produces goods that are distributed pursuant to a distribution agreement expressly made subject to Pennsylvania law. Plaintiff's injury allegedly arises from breach of the Agreement. Applying the standards established by the Supreme Court in *Burger King*, Plaintiff has met is burden of showing Defendant purposefully established minimum contacts with this forum such that he should reasonably have anticipated being haled into court here.

*Id.* at *1 (internal citation omitted); *see also TelAmerica Media Inc. v. AMN Tel. Mktg*, No. Civ.

A. 99–1244423, 1999 WL 1244423, at *1 (E.D. Pa. Dec. 21, 1999)("Defendants claim that the

Court lacks personal jurisdiction, venue, and subject matter jurisdiction. These objections are

clearly without merit as the non–compete agreement is a Pennsylvania Contract entered into

between Plaintiffs and Defendants, which contains a provision explicitly stating that

Pennsylvania law controls the agreement.").

In addition, this Court has long–recognized that utilizing the internet to access files from

a computer server in Pennsylvania – like Vitek and Hansen repeatedly did – constitutes a

purposeful contact with Pennsylvania. *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp.

1119, 1124 (W.D. Pa. 1997). In *Zippo*, the Court held that personal jurisdiction existed because

the defendant entered into agreements which would require it to send electronic communications

or data into Pennsylvania. *Id.* at 1126 ("Dot Com knew that the result of these contracts would

be the transmission of electronic messages into Pennsylvania. The transmission of these files

was entirely within its control. Dot Com cannot maintain that these contracts are 'fortuitous' or

'coincidental' ...)(citations omitted).

In *ACS Consulting Co., Inc. v. Williams*, No. 06–11301, 2007 WL 674608 (E.D. Mich.

Mar. 5, 2007), the Michigan court similarly held that an employee's access to the employer's

computer server established personal jurisdiction in the employer's action to enforce a non–

compete agreement. *Id.* at 7. The court noted that the California–based employee used the

internet to access the employer's computer servers in Michigan, which stored the very trade

secrets and proprietary information at issue in the litigation. *Id.* The court stated: "As a result

of [defendant's] activities using Plaintiff's servers in breach of his employment agreement,

Plaintiff lost proprietary information and trade secret data stored on Plaintiff's servers in

Michigan. This loss of proprietary trade secret information and consequential damages originated in Michigan." *Id.*[4]

Finally, the Tenth Circuit's ruling in a factually identical case – *Equifax Services, Inc. v. Hitz*, 905 F.2d 1355 (10th Cir. 1990) – is particularly instructive. When the employer sued its former employee in Kansas to enforce his non–compete agreement, he moved to dismiss and transfer venue on the basis that he was a local branch manager in California, performed his duties in California, and only traveled to Kansas on two occasions. *Id.* at 1357. The Tenth Circuit affirmed the denial of the employee's motion because he regularly interacted with and utilized the resources in the company's headquarters in Kansas in order to perform his job:

> Although defendant worked solely in southern California, ... [he] had regular contact with White & White employees in Kansas, both by telephone, mail, and through electronic data communications. Defendant's customers were invoiced from and made payment directly to White & White in Kansas. Defendant and his personnel were paid directly by White & White from Kansas, and that company's Kansas office reimbursed expenses for defendant's offices and provided those offices with necessary materials and supplies. Defendant also negotiated the terms of his employment contract directly with White & White's president, a contract which paid him $120,000 to $140,000 per year over his last two years of employment.

> \*        \*        \*

> That defendant's employment duties were carried out exclusively in California, however, cannot defeat jurisdiction. . . . The underlying dispute arises from defendant's relationship with his employer, and that relationship was a California–Kansas one. Defendant's two trips to Kansas merely reinforce the interstate character of that relationship. And the fact that defendant's employment contract provided it would be governed by Kansas law also reinforces defendant's "deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there."

*Id.* at 1358–59 (internal citations omitted).[5]

---

[4] *See also CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1261–65 (6th Cir. 1996)(transmitting 32 files to an Ohio corporation's computer server in Ohio, in association with a contract providing for the application of Ohio law, established minimum contacts).

Vitek and Hansen unquestionably possess the required minimum contacts with Pennsylvania. They knowingly entered into employment contracts which established continuous relationships with CentiMark, a Pennsylvania–based company. The then–existing president of CentiMark signed both agreements in Pennsylvania. Both agreements expressly provide that the employment relationships would be governed by Pennsylvania law. As *Burger King* and its progeny establish, those facts alone are sufficient to establish the required minimum contacts under the United States Constitution and Pennsylvania law.

Like the defendant in *Equifax*, both Vitek and Hansen had additional and far more extensive contacts with Pennsylvania in performing their job functions. In particular:

- Vitek and Hansen routinely called and e–mailed members of CentiMark's service department in Pennsylvania to request or arrange assistance for their customers. The customer service representatives in Pennsylvania also regularly worked directly to support the customers of Vitek and Hansen. Griffith Aff., ¶¶ 2–7.

- Many proposals and proposed contracts that Vitek and Hansen submitted to prospective customers -- and all warranty provisions included in those contracts -- were subject to review, modification, and acceptance by CentiMark's personnel in Pennsylvania. Welch Aff., ¶¶ 2–5; DeCecco Aff., ¶ 6.

- CentiMark invoiced Vitek's and Hansen's customers in Pennsylvania, and received payment from those customers in Pennsylvania. DeCecco Aff, ¶¶ 2–7.

- Vitek and Hansen received all salary, bonuses, benefits, and expense reimbursements under their employment agreements at CentiMark's headquarters in Pennsylvania. Kickbusch Aff., ¶¶ 2–8; Neal Aff., ¶¶ 2–6.

- Hansen visited CentiMark's headquarters in Pennsylvania on two occasions. Hansen Decl., ¶ 15.

- Vitek visited CentiMark's headquarters many times. In fact, Vitek attended meetings in Pennsylvania approximately six times during the last six months of his employment alone. Vitek Decl., ¶¶ 8–9.

---

[5] Like Hansen, the defendant in *Equifax* also argued that California law governed the non–compete agreement (despite its choice of Kansas law provision) in light of Section 16600 of the California Business and Profession Code. *Id* at 1360. The Tenth Circuit rejected this argument and applied the agreed–upon Kansas law. *Id.* In doing so, the court noted that California law was not in conflict with the agreed–upon Kansas law because both laws enforce non–compete agreements when trade secrets are involved. *Id.* and n.3.

In addition, Vitek and Hansen accessed CentiMark's proprietary business information on a daily basis from CentiMark's computer servers in Pennsylvania. The information – which lies at the very heart of this dispute – included customer data, customer proposals and contracts, customer credit histories, customer buying histories where available, pricing information, construction specifications, market intelligence and statistics, marketing strategies, and customer purchasing patterns. Wilson Aff., ¶¶ 6–8. Vitek and Hansen regularly accessed the intranet and CentiMark's extranet for the purpose of receiving and analyzing prospective and historic business transactions. *Id* at ¶¶ 5, 8. Hansen and Vitek also accessed their e–mail accounts, which utilize servers in Pennsylvania, multiple times daily. *Id* at ¶¶ 4, 10 For example, Hansen utilized his Blackberry device to access his CentiMark e–mail account in Pennsylvania approximately *572 times* from March 16, 2008 to April 15, 2008. *Id* at ¶ 10.

Like *ACS Consulting*, Vitek and Hansen used the internet to access CentiMark's computer servers in Pennsylvania to obtain the very trade secrets and proprietary information that CentiMark alleges they are unlawfully using (or will unlawfully use). The loss of this sensitive information will damage CentiMark in Pennsylvania. It is beyond dispute not only that Vitek and Hansen possess the required minimum contacts with Pennsylvania necessary to confer jurisdiction, but that those contacts are directly related to the issues in dispute in this case.[6]

Finally, it is important to note that Defendants' contacts with Pennsylvania after Vitek and Hansen resigned are also relevant to the jurisdictional analysis. *See Mellon Bank (East) PSFS, NA v. Farino*, 960 F.2d 1217, 1223–24 (3d Cir. 1992)(rejecting defendants' contention

---

[6] In the Motion, Defendants cite several cases for the proposition that an individual's contacts must be performed on his behalf, and not on his employer's behalf, in order to establish personal jurisdiction. Motion, p 11. Defendants fail to make clear that those cases involve attempts to obtain *general* jurisdiction over the individual As the above cases make abundantly clear, an individual's actions taken on behalf of a corporation can establish *specific* jurisdiction over the individual (in particular in disputes with his employer). CentiMark has never asserted that general jurisdiction exists over Hansen in Pennsylvania Instead, this Court has specific jurisdiction over him in this case based on his extensive contacts with Pennsylvania in conjunction with his employment with CentiMark

that only contacts occurring before the dispute arose, and not those intended to resolve the

dispute, are relevant in the minimum contacts assessment).  Vitek and Hansen both participated

in exit interviews via telephone conferences with a CentiMark representative in Pennsylvania.

Felton Aff., ¶ 4.  The CentiMark representative expressly reminded them of their post–

employment obligations under their employment agreements.  *Id*  These additional contacts

further render it fair and reasonable for Vitek and Hansen to have appreciated that a dispute to

enforce those obligations would be resolved in a Pennsylvania court.

    **3.**    **This Court Has Both General and Specific Jurisdiction Over Tecta**

        **a.**    **This Court Has General Jurisdiction Over Tecta Under**
            **the Alter Ego Theory**

        General jurisdiction exists if the defendant has maintained "continuous and substantial"

affiliations with the forum.  *Grand Entm't Group, Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476,

481 n.3 (3d Cir. 1993).  Under the "alter ego" theory, a parent company is subject to personal

jurisdiction based on its subsidiary's continuous business activities within the forum if the

"degree of control exercised by the parent [is] greater than normally associated with common

ownership and directorship."  *Simeone v. Bombardier–Rotax GMBH*, 360 F. Supp.2d 665, 675

(E.D. Pa. 2005); *Directory Dividends, Inc. v. SBC Comm., Inc.*, No. Civ. A. 01–CV–1974, 2003

WL 21961448, at *3 (E.D. Pa. July 2, 2003).

        Courts consider a number of factors in determining if a subsidiary is the alter ego of a

parent, including (but not limited to) a common marketing image, common use of trademark or

logos, common use of employees, and an integrated sales system.  *Id.*  In essence, the court must

determine if the parent exercises sufficient control over the subsidiary's operations such that it

"can be said to be a mere department of the parent."  *Simeone*, 360 F. Supp.2d at 676.  If such

control exists, both the parent and subsidiary are subject to personal jurisdiction in all

jurisdictions in which either company does business. *Directory Dividends*, 2003 WL 21961448, at *3.

In *Simeone*, the Eastern District applied the alter ego theory to exercise personal jurisdiction over a subsidiary based on its parent's continuous sales activities in Pennsylvania. *Simeone*, 360 F. Supp.2d at 676–78. While the court noted that the parent controlled the finances and management of its wholly–owned subsidiary, it also emphasized the parent's own representations to the public that the subsidiary was simply a department:

> Bombardier's representations to the public indicate that Bombardier viewed Rotax
> as simply a department itself. Phrases blurring the two companies together
> appeared repeatedly in Bombardier's annual reports. For instance, Bombardier
> treated Rotax's offices [in Austria] as its own . . . . Bombardier specifically
> attributed the design and build of Rotax engines as part of BRP's "line" and stated
> that BRP has a workforce of over 1,200 in Austria. . . . In sum, Bombardier
> projected a common marketing image by continuously holding itself and Rotax
> out to the public as a "single entity that is conveniently departmentalized either
> nationally or world–wide."

*Id.* at 678 (internal quotations omitted).

Similarly, the court in *Directory Dividends* applied the alter ego theory because the parent company admitted in press releases and its internet website proved that it operated its subsidiaries as a national telecommunications company with a single identity. *Directory Dividends*, 2003 WL 21961448, at *4. The parent company stated that it was adopting a "single brand" to provide a uniform presence in the marketplace, which would transform the company from a collection of regional companies to a national company with a single identity. *Id.* The parent also claimed all of the subsidiary's employees as its own, stating that it had 200,000 employees. *Id.* While certain of the subsidiaries maintained their own internet websites, each such site included the parent company's logo in an attempt to sell the subsidiary's products and services in different regions across the country. *Id.* Because the organization operated as a

single entity, with its subsidiaries serving as mere departments, the court held that the

subsidiary's contacts with Pennsylvania established jurisdiction over the parent. *Id* at **6–8.

Here, Tecta's own statements describing and marketing its operations unequivocally

establish it as a single national company, with its subsidiaries serving as mere departments of the

larger organization Tecta's internet website touts the fact that it operates as a single company:

> Tecta America Corp. is the nation's leading roofing contractor. ***With over 50 locations and over 3,000 qualified roofing professionals nationwide***, Tecta America has harnessed the strengths and resources of the nation's strongest roofing contractors ***into one company*** with ***one goal***: to provide ***the most comprehensive roofing program*** in the country to meet and exceed our customers' needs.
>
> As the industry leader, Tecta America has earned its reputation for excellence. No other roofing contractor can match Tecta America for resources, expertise, financial strength, or stability. The best names in the business, all under one roof – Tecta America.

Tecta Website (emphasis added). Tecta does not identify its subsidiaries as independent

companies on its website, but instead refers to them as "divisions," "operating units," or

"locations" of Tecta. *Id.* Like the parent companies in *Simeone* and *Directory Dividends*, Tecta

holds out the subsidiaries' offices and employees as its own.

Tecta also describes the uniform roofing services provided as its services, rather than

those of its subsidiaries. It also describes company–wide products and initiatives, such as its

Tecta Green Roof system, as Tecta's. *Id.* Tecta's website provides pictures and descriptions of

certain roofing jobs that it performed, attributing the actual work to Tecta America. *Id.*

Conspicuously absent is the identification of the division which actually performed the work.

Tecta's own president, Mark Santacrose, has expressly stated in a trade journal: "We are a

single company with a number of different operating locations that share ownership." Michael

Russo, *Roofing/Siding/Insulation*.  The article further demonstrates that Tecta controls and

manages each operating division:

> Tecta provides each newly acquired operating unit with the full scope of its
> corporate strengths, including strong management at the local operating level,
> increased marketing resources, safety and productivity programs, and solid
> financial strengths, including insurance, bonding, and a strong balance sheet.

*Id.*

Tecta's operating division known as Potteiger–Raintree, Inc. maintains an office in Glen

Rock, Pennsylvania.  *See* Excerpts of Potteiger–Raintree website.  This operating division has

performed, and continues to perform, roofing services in Pennsylvania.  *Id.*  Tecta acknowledges

that this division generated approximately $2.5 million in revenue in 2007 from its continuous

and substantial sales in Pennsylvania.  Declaration of Mark F. Santacrose, ¶ 12.  While the

operating division has its own website, that site has the Tecta name and logo, mirrors the Tecta

site, and refers to itself as a division as Tecta.  In fact, the website states:

> With Tecta, you'll have peace of mind, knowing that you'll always receive fast,
> priority service whenever – and wherever – you need it. Thanks to our extensive
> network of resources nationwide, we are fully prepared and ready to mobilize the
> right equipment, materials and skilled personnel to handle any emergency.
>
> Today Tecta offers you a single, reliable source you can count on for all of your
> roofing needs coast to coast – from roof replacement, new construction, repair,
> and maintenance to full service nationwide roofing management.

*See* Excerpts of Potteiger–Raintree website.

This subsidiary's office and continuous activities in Pennsylvania clearly confer general

jurisdiction over Tecta under the alter ego theory.  Tecta's argument to the contrary is little more

than a grossly misplaced attempt to escape litigation in a jurisdiction in which it enjoys a

substantial and lucrative presence.

### b.    This Court Has Specific Jurisdiction Over Tecta

This Court also maintains specific jurisdiction over Tecta. Tecta acknowledges that its representatives traveled to CentiMark's headquarters in Pennsylvania to meet with CentiMark about a potential transaction, signed the Tecta Agreement with CentiMark to enable the parties to explore such a transaction, exchanged correspondence with CentiMark in Pennsylvania, and participated in a telephone conference with CentiMark in Pennsylvania. Motion, p. 17. These numerous contacts establish personal jurisdiction. *Grand*, 988 F.2d at 483 ("Where the contacts evaluated are those giving rise to the litigation, even one contact with the forum may be enough to justify jurisdiction"); *Carteret Savings Bank, FA v. Shushan*, 954 F.2d 141, 147–48 (3d Cir.), (correspondence and phone calls to individuals in New Jersey, and attendance at a single meeting in that state, established personal jurisdiction), *cert. denied*, 506 U.S. 817 (1992).

Tecta also ignores the fact that courts also consider communications occurring after the dispute arose, and the "contemplated future consequences" of a defendant's conduct, in the minimum contact analysis. *Mellon Bank*, 960 F.2d at 1223–24. After Vitek and Hansen resigned, Tecta's president telephoned CentiMark in Pennsylvania to discuss Tecta's decision to hire them. A CentiMark representative in Pennsylvania responded via e–mail stating that it would pursue legal action to enforce its rights. These communications not only constitute additional contacts with Pennsylvania, but also reflect Tecta's knowledge that the "contemplated future consequences" of its decision to hire Vitek and Hansen, despite their non–compete and non–disclosure obligations with respect to the proprietary information of their Pennsylvania–based former employer, would impact CentiMark in Pennsylvania.

Finally, Tecta's contention that its contacts with Pennsylvania are unrelated to CentiMark's claims against it is meritless. The continuing obligation not to hire CentiMark's

24

senior managers (like Vitek and Hansen) arose directly out of the negotiations between Tecta and

CentiMark at CentiMark's Pennsylvania headquarters. Tecta's breach of that very obligation is at

issue in this case. Furthermore, CentiMark's tort claims associated with the hiring of Vitek and

Hansen – including claims for tortious interference, unfair competition, misappropriation of trade

secrets, inducement of breach of fiduciary duties, and civil conspiracy – turn upon Tecta's access

to CentiMark's trade secret and proprietary information, which Tecta obtained (by hiring Vitek

and Hansen) from CentiMark's computer servers in Pennsylvania. Tecta's access to this

Pennsylvania–based information lies at the heart of the tort claims against Tecta.

**C.    Venue is Proper in this Court**

Venue in a diversity action is proper in any "judicial district in which a substantial part of

the events or omissions giving rise to the claim occurred, or a substantial part of property that is

the subject of the action is situated." 28 U.S.C. § 1391(a)(2)(2008). As set forth above,

Defendants' contacts and communications with Pennsylvania – and, in particular, Defendants'

receipt of CentiMark's proprietary trade secret information from its computer servers in

Pennsylvania – lie at the very heart of CentiMark's claims.

In *BABN Technologies Corp. v. Bruno*, 25 F. Supp.2d 593 (E.D. Pa. 1998), the Eastern

District of Pennsylvania held that venue was proper in a Pennsylvania–based employer's action

against a former employee in Texas. *Id.* at 597. The employment agreement was signed in

Pennsylvania, contained a Pennsylvania choice of law provision, and enabled the employee to

obtained the trade secrets at issue from Pennsylvania. *Id.* at 596 n.2. The court held that venue

was proper under Section 1391(a)(2), stating:

> In this case, some of the same facts that establish personal jurisdiction also
> establish that venue is proper in this District. The agreement between Bruno and
> BABN was executed and took effect in Pennsylvania. The alleged acquisition of
> trade secrets and propriety [sic] and confidential information allegedly occurred,

> in large part, during Bruno's employment in Pennsylvania. Moreover, it is
> Bruno's alleged breach of the non–compete provision in his employment contract
> and the alleged sharing of proprietary and confidential information with his new
> employer that lies at the heart of BABN's claims. Accordingly, I find that BABN
> has sufficiently alleged that a "substantial part" of the events giving rise to its
> claims "occurred" within Pennsylvania.

*Id.* at 597 (internal citations omitted); *see also ACS Consulting*, 2007 WL 674608, at *7

("Plaintiff's loss of proprietary information and trade secrets from its servers in Michigan, and

therefore its cause of action against Mestril, necessarily arose in Michigan as a result of Mestril's

continuous ... electronic activities in Michigan.").

    *BABN* is directly on point. CentiMark executed all of the contracts at issue – the Vitek

Agreement, Hansen Agreement, and Tecta Agreement – in Pennsylvania. Both of the

employment agreements expressly state that they are governed by Pennsylvania law.

Defendants' acquisition of CentiMark's trade secrets and confidential information occurred by

virtue of internet access to CentiMark's computer servers in Pennsylvania. It is the breach of

these agreements, and Vitek's and Hansen's sharing of CentiMark's trade secrets and confidential

information with Tecta, that lies at the heart of all of CentiMark's claims.

    Even if the Court were to disagree that substantial events and/or omissions took place in

Pennsylvania, but instead took place California and Illinois as Defendants allege (or in any other

states where Defendants have customers, for that matter), venue would remain proper in this

Court. The "catchall" provision in Section 1391(a)(3) provides that venue is proper in any

district in which any defendant is subject to personal jurisdiction if there is no jurisdiction in

which the action could otherwise be brought. 42 U.S.C. § 1391(a)(3).

    In *McCaskey v. Continental Airlines, Inc.*, 133 F. Supp.2d 514 (S.D. Tex. 2001), the court

held that venue was proper under the catchall provision because no other jurisdiction existed in

which venue was proper over all defendants. *Id.* at 525–26. The court rejected the defendant's

argument that the plaintiff could have brought the action in Arizona, stating:

> This argument is incorrect. Section (a)(3) requires that another district exists in
> which Plaintiff can establish both personal jurisdiction and venue over each party
> and each claim in the entire "action," not just a single claim versus MedAire. In
> order to reach this conclusion, the Court necessarily concludes that the term
> "action" seen in section (a)(3) is more broad than "claim," which is used in section
> (a)(2). An action, unlike a claim, encompasses all the parties and claims presently
> and promptly before this Court. Thus, in order for MedAire to persuade the Court
> that venue is not proper under the fallback, it must show not just that it could have
> been sued in Arizona, but that the whole action, involving multiple properly
> joined parties and claims could have been brought in another district court . .

*Id.* at 526 (internal citations omitted). Because the other defendants were not subject to personal

jurisdiction in Arizona, the court held that venue was proper in Texas and denied MedAire's

motion to dismiss or transfer. *Id.*; *see also FS Photo, Inc. v. PictureVision, Inc.*, 48 F. Supp.2d

442, 448–49 (D. Del. 1999)(Section 1391(a)(3) does not apply if another district exists in which

the entire case, including all claims against all defendants, could have been brought).

Nowhere in the Motion do Defendants identify another district in which CentiMark could

have properly brought its claims against Vitek, Hansen, and Tecta. Instead, Defendants state that

CentiMark should be required to maintain multiple lawsuits against these co–conspirators in

separate district courts throughout the United States. The very purpose of the catchall provision

in Section 1391(a)(3) is to avoid such an absurd, inefficient, and potentially problematic result.

Defendants' motion to dismiss based on improper venue should therefore be summarily denied.

**D.     Venue Should Not Be Transferred to Multiple District Courts Located
         Throughout the United States**

Defendants' alternative motion to transfer venue "for the convenience of the parties and

witnesses" under 28 U.S.C. § 1404(a) is nonsensical. Defendants brazenly assert that it would be

judicially efficient, and in the interests of justice, to compel CentiMark to proceed with separate

actions in separate courts located hundreds of miles apart. Defendants cite no authority for the proposition that a court should transfer the case in such a manner.[7]

Section 1404(a) expressly states that "a district court may transfer *any civil action* to any other district or division where it might have been brought." 28 U.S.C. § 1404(a)(2008) (emphasis added). In *McCaskey*, the court held that this provision also prevented it from invoking Section 1404(a) to transfer the action to Arizona. *McCaskey*, 133 F. Supp.2d at 529 ("Moreover, for much the same reasons seen in the Court's above discussion of proper venue, Arizona is not a place where this action 'might have been brought.' An Arizona court could not have obtained jurisdiction and venue over all parties and claims now before the Court.")(citations omitted). Because CentiMark could not have brought the entire action in either Illinois or California, this Court cannot invoke Section 1404(a).[8]

Defendants' argument would fail even if this Court could transfer claims to both Illinois and California. As a plaintiff filing suit in its home state, CentiMark's chosen forum "is accorded great deference and defendants have the burden of proving the necessity of transfer." *TJS Brokerage & Co., Inc. v. Mahoney*, 940 F. Supp. 784, 792 (E.D. Pa. 1996). Pennsylvania also has a significant interest in enforcing employment agreements entered by its residents, and in particular those which apply Pennsylvania law (like the Vitek and Hansen Agreements). *See BABN*, 25 F. Supp.2d at 598–99 (refusing to transfer venue because the action involved a

---

[7] Defendants conveniently ignore the fact that CentiMark has alleged a civil conspiracy claim against all Defendants. Verified Complaint, Count VII. They do not cite case law in which a court required a plaintiff to file separate actions in separate courts against each co-conspirator. Such a result is neither convenient for the witnesses nor in the interests of justice.

[8] In the rare circumstances in which severance would be appropriate under Rule 21 of the Federal Rules of Civil Procedure to separate a misjoined party or claim, a court can transfer a portion of the action to another jurisdiction. *McCaskey*, 133 F. Supp.2d at 526 n.14. Defendants have not moved for severance under Rule 21. Nor could Defendants prevail in such a motion. *See In re High Fructose Corn Syrup Antitrust Litig.*, 293 F. Supp.2d 854, 862–63 (C.D. Ill. 2003)(denying motion to sever because claims arose out of the same occurrence and involved common questions of law/fact, the case involved a civil conspiracy, and a substantial number of the same witnesses and documents would be needed to resolve all of the claims).

28

Pennsylvania employer, an agreement governed by Pennsylvania law, and the trade secrets and proprietary information located in Pennsylvania).

Defendants cannot meet their heavy burden. The bulk of the documents involved in the case – including CentiMark's customer data, pricing information and strategies, warranty data, sales histories and statistics, marketing strategies, bids/quotes, proposals, expense reports, and personnel files for Vitek and Hansen – are located in Pennsylvania. Many of CentiMark's witnesses are also located in Pennsylvania. Defendants have not identified any documentary evidence which is located elsewhere. Nor have Defendants identified a single witness located in another jurisdiction or any other proof that can not be made available conveniently in Pennsylvania. *See General Refractories Co. v. Washington Mills Electro Minerals Corp*, No. Civ. A. 94–6332, 1995 WL 361164, at *4 (E.D. Pa. June 16, 1995)("If, however, the moving party merely alleges that the interests of witnesses will be served by a transfer, without identifying [in an affidavit] those witnesses and indicating to what they will testify, a motion to transfer based on the convenience of witnesses will be denied."); *PPG Indus., Inc. v. Systonetics, Inc.*, 614 F. Supp. 1161, 1164 (W.D. Pa. 1985)(defendants must "make the necessary statements concerning what their [witness] testimony will cover or demonstrate the materiality of such evidence that this Court may properly balance the parties' interests.").

Finally, Defendants ignore the obvious fact that requiring CentiMark to resolve its claims in separate courts hundreds of miles away will be incredibly costly and inconvenient to both CentiMark and the judicial system. CentiMark would need to present the testimony of all witnesses – including Vitek, Hansen, and certain Tecta employees – in an action in California. CentiMark would need to present nearly identical testimony in a parallel action in Illinois. CentiMark would have to present the very same documents as evidence in those courts.

Defendants' contention that requiring CentiMark to proceed in separate actions in this manner is convenient, and furthers the interest of justice, is little more than an exercise in self serving rationalization. Its motion to transfer venue should therefore be denied.

**E.    Hansen's Limited Anticipatory Declaratory Judgment Action in California Cannot Prevent This Court From Adjudicating this Action**

Hansen's contention that this action should be dismissed or stayed in light of the cursory complaint for declaratory relief that he rushed to file in his home state of California is baseless. CentiMark has moved to dismiss the California action as an improper anticipatory action intended to force CentiMark, the true plaintiff, to pursue its claims against Hansen in his chosen forum.

It is well–established that such a superficial declaratory judgment action is not afforded with "first–filed" status. *See EEOC v. University of Pennsylvania*, 850 F.2d 969, 971–72 (1988)(upholding refusal to dismiss action in favor of defendant's previously–filed declaratory judgment action in another jurisdiction), *aff'd*, 493 U.S. 182 (1990); *FM Corp. v. AMVAC Chemical Corp.*, 379 F. Supp.2d 733, 745 (E.D. Pa. 2005)(denying motion to dismiss/transfer, and refusing to apply the first–filed rule, because it "appears from the instant record that AMVAC wished to circumvent this Court's jurisdiction over the instant matter . . . and preempt FMC's filing in the Eastern District of Pennsylvania."). Accordingly, this Court need not – and should not – dismiss or transfer CentiMark's claims against Hansen.

**1.    District Courts Only Exercise Jurisdiction if Doing So Will Achieve the Purposes of the Declaratory Judgment Act**

In his limited action in California, Hansen seeks only a ruling that his non–compete is unenforceable under the Declaratory Judgment Act. *See* 28 U.S.C. § 2201 (2008). While that statute empowers district courts to entertain such actions, courts are not *required* to exercise their

jurisdiction if doing so will not achieve the limited purposes of the Declaratory Judgment Act.

*Zide Sport Shop of Ohio, Inc. v. Ed Tobergate Assocs., Inc.* 16 Fed. Appx. 433, 437 (6th Cir.

2001)("A plaintiff, even one who files first, does not have a right to bring a declaratory judgment

action in the forum of his choosing."); *Mission Ins. Co. v. Puritan Fashions Corp.*, 706 F.2d 599,

601 (5th Cir. 1983)("the Declaratory Judgment Act 'gives the court a choice, not a

command.'")(internal citation omitted). Those limited purposes are to clarify and resolve

controversies in which (1) imminent but unnecessary damages can be avoided or (2) one party

could sue to obtain damages or injunctive relief, but has not promptly done so. *Tempco Elec.*

*Heater Corp. v. Omega Eng'g, Inc.*, 819 F.2d 746, 749 (7th Cir. 1987).

Courts often refuse to adjudicate declaratory judgment actions when doing so would not

advance either of these purposes. For example, in *Koch Engineering Company, Inc. v. Monsanto*

*Company*, 621 F. Supp. 1204 (E.D. Mo. 1985), the court dismissed the plaintiff's declaratory

judgment action because it did not satisfy either of the Declaratory Judgment Act's purposes.

The court explained:

> In deciding whether to allow [plaintiff] to proceed with this lawsuit, the court
> must look to the purpose of the Declaratory Judgment Act. The Act was intended
> to provide a remedy which would "minimize the danger of avoidable loss and the
> unnecessary accrual of damages and to afford one threatened with liability an
> early adjudication without waiting until his adversary should see fit to bring an
> action after the damage has accrued." 10A C. Wright, A. Miller and M. Kane,
> *Federal Practice and Procedure* § 2751 at 569 (1983).

*Id.* at 1206–07. Because the breach of contract had allegedly already occurred, and the defendant

filed its own lawsuit to recover the resulting damages just two weeks after plaintiff commenced

its declaratory judgment action, the court held that "allowing this suit to proceed under these

circumstances will not promote any of the purposes of the Declaratory Judgment Act." *Id.* at

1207.

2.    **District Courts Dismiss Improper Declaratory Judgment Actions**
      **Intended to Forum Shop and/or Invoke Favorable Law**

Prospective defendants who suspect that they will be sued occasionally misuse the

Declaratory Judgment Act in an attempt to require the prospective plaintiff to pursue its action in

a forum of the prospective defendants' choosing.  One district court explained the impropriety

associated with such forum shopping as follows:

> The device of the declaratory judgment can thus, when cleverly employed, be an
> effective aid to forum shopping by a party who anticipates that a suit is about to
> be filed against it.  Proper forum selection should not be confused with improper
> forum shopping.  A plaintiff seeking redress for a cognizable injury is entitled, to
> the extent able to chose among several forums, to select the one that it finds most
> attractive.  Forum shopping, on the other hand, occurs when a party, perceiving
> that it may find itself forced into a disadvantageous forum, seeks to manipulate
> the procedural devices to secure and advantage which, were those devices not
> available, it could not employ to defeat its opponent's choice of forum.

> One of those devices, as the foregoing cases make clear, is the declaratory
> judgment.  But the limited opportunity afforded by the Declaratory Judgment Act,
> 28 U.S.C. § 2201 to seek a declaration of rights where an opponent may be
> disinclined to do so, or where the underlying controversy has not fully matured,
> should not be employed for other purposes, such as to tolerate, much less reward
> forum shopping.  Indeed, some courts have noted that a first–filed declaratory
> judgment action may be deemed moot once the substantive action on the
> underlying merits has been filed.  As the Seventh Circuit has noted ... where the
> substantive plaintiff has filed its suit and raised all the issues originally sought to
> be adjudicated by the first–filer's declaratory judgment action, the initial
> "declaratory judgment serves no useful purpose."

*International Union v. Dana Corp.*, No. 3:99CV7603, 1999 WL 33237054, at *4 (N.D. Ohio

Dec. 6, 1999)(internal citations omitted), *reconsideration denied*, 2000 WL 1182883 (N.D. Ohio

Mar. 22, 2000).

In *Schmitt v. JD Edwards World Solutions Co.*, No. C01–1009, 2001 WL 590039 (N.D.

Cal. May 18, 2001), a case directly on point, the California court in which Hansen's action is

pending dismissed a preemptive action brought by an employee seeking a declaration that the

restrictive covenants in his employment contract with a former employer were unenforceable.

*Id.* at **2–3. When the employee joined a competitor in violation of those restrictive covenants,

his former employer disclosed its intention to sue him in a Colorado court. *Id.* at *1. The

employee immediately filed a declaratory judgment action in state court in California the very

next day. *Id.* After the case was removed, the California court granted the former employer's

motion to dismiss, stating:

> If a court is faced with two suits, a first filed declaratory relief action and a
> subsequent coercive suit filed in a different court, and the court determines that
> the declaratory suit is a preemptive suit meant to deprive the natural plaintiff of
> the forum of his choice, the court should dismiss or stay the declaratory suit.
> *Alltrade, Inc. v. Uniweld Prods., Inc.*, 946 F.2d 622, 628 (9th Cir. 1991); *Moore's*
> [James W. Moore, *Moore's Federal Practice*] at § 57.42[3]. This prevents forum
> shopping by a declaratory plaintiff who files suit in anticipation of being sued by
> a natural plaintiff.

*Id.* at *2; *see also Charles Schwab & Co., Inc. v. Duffy*, No. C98–03612, 1998 WL 879659, at *1

(N.D. Cal. Dec. 8, 1998)(dismissing anticipatory declaratory judgment action to avoid rewarding

"a race to the courthouse that appears to have been 'won' by Schwab.").

Courts have recognized that anticipatory plaintiffs file declaratory judgment actions not

only to select a more convenient forum, but also where they believe that the first–filed court may

be more likely to apply what they perceive to be favorable law. For example, in *BASF*

*Corporation v. Symington*, 50 F.3d 555 (8th Cir. 1995), the Eighth Circuit reversed the entry of a

declaration that the defendant's imminent personal injury action against the plaintiff would be

time–barred by the statute of limitations. *Id.* at 556. The court held that the anticipatory action

was intended to take advantage of a more favorable statute of limitations, therefore constituted a

"misuse" of the declaratory judgment act, and should have been dismissed. *Id.* at 559 ("Here, we

are convinced that BASF's declaratory action in North Dakota is chiefly calculated to take

advantage of favorable statute of limitations."). In *Mission Insurance*, the Fifth Court similarly

rejected a declaratory–plaintiff's attempt to select a forum that might apply more favorable

insurance coverage law. *Mission Insurance*, 706 F.2d at 602 n.3 ("There are indications that forum shopping was an element in this case. Mission states that the burden of proof in regard to the loss may differ in California and Texas, an important fact in this case since even proving that the thefts occurred may require resort to complicated accounting analyses.").

Finally, courts have emphasized that an anticipatory declaratory judgment action which encompasses only a single issue – and will not resolve the entire dispute between the parties – should be dismissed to avoid duplicative litigation. In dismissing the former employee's action in *Schmitt*, the California court noted that the employer's second–filed action was not limited to the breach of the non–compete agreement, but also included two claims involving the disclosure of trade secrets, rendering the subsequent suit a more appropriate forum. *Schmitt*, 2001 WL 590039, at *3. Similarly, the court in *Koch* explained:

> As an initial matter, it is important to note that the two actions are not identical. Koch's action in this Court seeks a declaration of the parties' rights under contract. Monsanto's action, filed in the Southern District of Texas, seeks damages for breach of contract, breach of warranty, negligence and a violation of the Texas Deceptive Trade Practices Act. . . . This Court must also consider which of the two actions will best serve the needs of the parties by providing a comprehensive solution to the entire controversy. . . [I]t is quite obvious to this Court even at this early stage in the proceedings that Monsanto's suit in the Southern District of Texas will fully resolve the controversy between the parties. By dismissing Koch's petition for declaratory judgment, this Court avoids both the uncertainty of a possible premature injunction and/or the burden and expense on the courts and the parties associated with duplicate lawsuits.

*Koch*, 621 F. Supp. at 107–08. Accordingly, Hansen's transparent attempt to wrongfully employ the Declaratory Judgment Act to gerrymander venue to his perceived, but improper, advantage should not be allowed.

3.    **The California Action is a Blatant Attempt to Forum Shop
Which is Likely to be Dismissed**

CentiMark has moved to dismiss the California Action as an anticipatory declaratory judgment action intended to preempt CentiMark's imminent filing of the this action. When Hansen resigned on April 21, 2008, he realized that CentiMark intended to enforce the restrictive covenants contained in the Agreement. On April 22nd, CentiMark expressly advised Tecta that it was considering its options to address its hiring of Hansen and Vitek, including (but not limited to) litigation. The following day, on April 23rd, Hansen commenced this action seeking a declaration that the restrictive covenants are not enforceable. The fact that Hansen did not contemporaneously move for a preliminary injunction to prevent the enforcement of those covenants further proves that Hansen filed this action not to obtain emergency equitable relief, but merely to select a perceived advantageous forum in which to resolve CentiMark's claims.[9]

It is therefore not surprising that adjudicating this action will not satisfy either of the purposes of the Declaratory Judgment Act. Hansen did not file this action to avoid the accrual of imminent monetary damages. To the contrary, Hansen contends that there are no cognizable damages at issue because the Hansen Agreement is purportedly void and unenforceable. Nor can Hansen plausibly allege that he filed the action because CentiMark threatened him with, but had not promptly pursued, litigation. CentiMark advised on April 22, 2008 that it might pursue litigation, and Hansen filed this action the very next day. CentiMark promptly filed this action on April 30th, just seven (7) business days after Hansen resigned. Unlike Hansen, CentiMark

---

[9] Hansen states in the Motion that he contacted an un–named attorney to assess the enforceability of his restrictive covenants before he resigned from CentiMark. The attorney that filed the California action on his behalf after CentiMark threatened him with a lawsuit does not appear to be his lawyer, however, but instead a member of *Tecta's* outside law firm. This fact belies Hansen's implication that he had been contemplating litigation of his own before CentiMark threatened him with a suit.

immediately sought a temporary restraining order, expedited discovery, and a preliminary injunction.

It appears that Hansen's forum shopping involves not only a desire to chose a convenient forum, but also a desperate but misguided attempt to invoke California law. The parties expressly agreed that the Hansen Agreement would be governed by Pennsylvania law. *See* Hansen Agreement, Article 4.3. Hansen asserts in his California complaint, however, that the Agreement's restrictive covenants are unenforceable under California law. Despite his contention to the contrary, Hansen apparently believes that a California court would be more likely than a non–California court to ignore the agreed–upon choice of law, apply California law, and determine that the restrictive covenants are unenforceable under California law.[10] Prohibiting such forum shopping is the very reason that many courts dismiss anticipatory declaratory judgment actions aimed at obtaining such a tactical advantage.

Finally, and like *Schmitt* and *Koch*, dismissing the anticipatory action in California will preserve judicial economy. CentiMark's claims against Hansen in this action are not limited to the single issue that he has raised in California – the enforceability of the restrictive covenants in the Hansen Agreement – but also include tort claims for misappropriation of trade secrets, unfair competition, tortious interference, breach of fiduciary duties, and civil conspiracy. Hansen's co–

---

[10] Hansen's contention that Pennsylvania courts would apply California law is incorrect. In the cases that Hansen cites, the Eastern District of Pennsylvania applied California law only in restrictive covenant cases which did not involve trade secrets and/or involved only California sales activities. *See General Video Corp v. Soule*, No. Civ. A. 99–CV–5117, 2000 WL 328118, at **8–10 (E.D. Pa. Mar. 27, 2000)(stating in dicta, after determining that defendant was not competing with his former employer, that California law would apply because the defendant and his new company were both in California); *Cottman Transmission Sys., Inc. v. Melody*, 851 F. Supp. 660, 671 (E.D. Pa. 1997)(applying Pennsylvania law in a franchise action which did not involve trade secret claims). Many courts have refused to ignore the parties' chosen law, rejecting California employee's contention that the California statute addressing restrictive covenants requires the application of California law, in non–compete cases in which the employee is alleged to have misappropriated trade secrets obtained from a state other than California. *See, e.g., Estee Lauder Cos. Inc. v. Batra*, 430 F. Supp.2d 158, 170–73 (S.D.N.Y. 2006)(applying chosen New York law to non–compete agreement of California employee whose responsibilities extended nationwide); *Lowry Computer Prods., Inc. v. Head*, 984 F. Supp. 1111, 1113–15 (E.D. Mich 1997)(applying chosen Michigan law to non–compete agreement of California employee with alleged access to trade secrets).

36

conspirators, Tecta and Vitek, are also parties to this action. The present action is the only proceeding that can afford all interest parties complete and comprehensive relief.

Respectfully submitted,

**BUCHANAN INGERSOLL & ROONEY** PC

By: /s/ Gregory J. Krock
    Peter S. Russ
    Pa. I.D. No. 58284
    Gregory J. Krock
    Pa. I.D. No. 78308

One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA 15219–1410
(412) 562–3960/3983
(412) 562–1041 (fax)

Attorneys for Plaintiff, **CentiMark Corporation**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the within

**Memorandum of Law in Opposition to Defendants'' Motion to Dismiss** was filed with the

Court on Monday, July 7, 2008 via the CM/ECF system, which system will send notifications of

the filing to the following counsel:


Otto W. Immel
QUARLES & BRADY LLP
1395 Panther Lane
Suite 300
Naples, FL 34109


Mary–Jo Rebelo
HOUSTON HARBAUGH, PC
Three Gateway Center
401 Liberty Avenue, 22nd Floor
Pittsburgh, PA 15222–1005


/s/ Gregory J. Krock
Gregory J. Krock